[Civ. No. 22178.   Second Dist., Div. Two.   July 16, 1957.]

DANIEL A. MUNNS, JR., et al., Respondents, v. ALEX STENMAN, as Building Official of the City of Monrovia, et al., Appellants.

Homer H. Bell, City Attorney, O'Melveny & Myers, Pierce Works, Howard J. Deards and William D. Moore for Appellants.

LeSage & Bowman for Respondents.

ASHBURN, J.—The city of Monrovia, a sixth class municipal corporation, its Building Official and the members of its city council, appeal from a judgment commanding them and other officials required to pass upon building permits to issue such a permit to petitioners, Daniel A. Munns, Jr., and Virginia Munns, authorizing construction of a single family residence upon property owned by them in the Hidden Valley area of said municipality; also to issue to petitioners Jonathan Lloyd and Ruby Lloyd[1] a like building permit for their lot situated in the same area.

Hidden Valley is a hillside and valley area situated in the northerly part of the city of Monrovia. Before presentation of Munns' application for a permit (which was prior to that of Lloyd) there were some 14 residences in the valley and 30 unimproved residence sites; those homes had been constructed subsequent to July 1, 1946.

On November 3, 1953, Mr. Munns, an architectural draftsman, presented to the building department of the city an application for a permit to construct a $20,000 residence upon a lot which he had purchased in March, 1952. The application was accompanied by appropriate plans in which the building department found no deficiencies and to which they made no objections. No permit was issued. Mr. Fritz Zapf, City Engineer, told Munns about two weeks after the application was filed that "permits were not being issued in the area and he was not allowed to issue any."

This official attitude reflected a policy which the city had

---

[1]Reference will be made to Munns and Lloyd in the singular; the co-petitioners are the respective wives.

put into effect some months prior to Munns' application. The city manager, city engineer, city attorney and other officials had concluded that the existing parcels in the valley, improved and unimproved, did not comply with the state law or local ordinances prescribing conditions for subdivisions; that they were part of an illegal subdivision; and that all of such parcels should be brought into line with local subdivision requirements before any building permits would be granted. This involved uncompensated dedication of land for public streets, revamping of property holdings to conform to the subdivision ordinance,—''requirements as to size, shape, location, grade, access, provisions for public utilities, etc.'' (quoting appellants' opening brief). Munns and Lloyd were not subdividers, had no intention of becoming such, and had purchased their lands without any knowledge of the claim of an unlawful subdivision; they had not participated in any of the acts alleged to have effected that illegal result. The court found that appellants ''have, from time to time, asserted to petitioners that the entire Hidden Valley area would have to comply with various subdivision standards before petitioners would be granted permission to use their land for R-1 purposes;'' also that ''the actions and conduct of the respondents [appellants] taken under the color of said ordinances, but not dictated by or justified by said ordinances, followed a general policy from time to time asserted by the respondent city and its officers, that the entire Hidden Valley area would have to comply with various standards and that various improvements never specifically defined or stated would have to be made before building permits would be issued to petitioners Lloyds and Munns.'' Petitioners had no control over other property holders, whose existing residences had been erected under permits from the city building department. The reply brief piously concedes that ''[e]veryone can sympathize with petitioners who have invested $3,500 in lots and are presently unable to build on them.''

The building ordinance then in effect, Number 1190, contained no such requirements for a permit and prior to enactment of amending ordinance Number 1200, on December 1, 1953, the city officials who refused building permits had no better authority than their own *ipse dixit*. That ordinance was introduced and had its first reading on November 17, 1953. It was on that day that City Engineer Zapf told petitioner Munns he was not allowed to issue any permits in the Hidden Valley area. ''He said, however, because I have the frontage

on Alta Vista Avenue they could not deny me a permit, but I would have to put up a bond guaranteeing I would put up a six-foot fence fronting on Hidden Valley Road before they would issue a permit for it, and if I did so they would issue a permit for it." Also, "that the rear portion of the lot which abutted on Hidden Valley Road shall be fenced by a six-foot minimum height fence; said fence shall have no gates or openings into Hidden Valley Road. . . . That these improvements should be in place before a building permit could be issued." Of course Munns did not consent to this.

Accepting as we must all evidence and inferences favorable to respondents (*New* v. *New*, 148 Cal.App.2d 372, 383 [306 P.2d 987]), it appears that the background facts are as follows. Munns' lot has three frontages, Alta Vista Avenue, Cloverleaf Road and Hidden Valley Road; the city claimed (and now claims, contrary to the trial judge's finding) that none of them was a dedicated public street except Alta Vista Avenue. Munns has a curved frontage of 81 feet on that street, 82 feet on Hidden Valley Road, and 67 feet on Cloverleaf Road. The Alta Vista frontage is the highest part of his land. The court found "that the property of petitioner Munns has an area sufficient for residential building purposes of sloping but not steep land extending to the rear part of the land of said Munns where it rises sharply upwards to Alta Vista Avenue, a formally dedicated public street, and access by automobile from Munns' property to Alta Vista Avenue is not presently practicable in its natural condition." Petitioner's plans as submitted showed a driveway from the house to Alta Vista. Petitioner told Mr. Zapf that he intended to build such a driveway but the city officials, apparently not believing that he would do so, insisted upon bottling him up so that he could have no ingress or egress at all over the more convenient arteries of Cloverleaf and Hidden Valley Roads.

This plan of coercing all the valley residents into revamping their properties to conform to the city's existing subdivision ordinance—doing so through the withholding of permits from those who had not yet built—was carried into ordinance Number 1200 which was introduced on the same day as the Munns-Zapf conversation, November 17, and enacted on December 1, 1953. Munns had no notice or information concerning it before its introduction. It carries an emergency clause and adds to the existing ordinance a section 6.1, reading as follows: "Before any permit may be issued, except for repair or minor remodeling of an existing structure, it must appear that:

"(a) All laws of the City of Monrovia pertaining to zoning, subdivision, set-back lines, fire, and other laws, rules and regulations, applicable to the property for which the permit is sought have been complied with, and that the granting of said permit will not result in a contravention of any such law, rule or regulation of the City of Monrovia.

"(b) The lot, parcel, or unit of land for which the permit is sought has a minimum frontage of abutment on a dedicated street of not less than 33 feet, and access for automobiles and other vehicles and for pedestrians shall be provided to and from said dedicated street over said frontage of abutment.

"(c) The lot, parcel or unit of land for which the permit is sought conforms in all respects as to size, shape, location, grade, access, provisions for public utilities, including water, electricity, gas, telephone, mail delivery, sewers, drainage, garbage collection, street surfacing, curbs, gutters and other improvements and specifications to the requirements which would be imposed upon said property if it were a part of land proposed to be subdivided under any ordinance of the City of Monrovia. 'Access' as herein required shall be by dedicated streets as hereinabove provided.

"(d) The use for which said permit is sought will not materially increase the danger of fire or flood or the results of fire or flood, and will not be detrimental to health or sanitation." All of its provisions, including that requiring 33 feet of frontage upon a dedicated public street and the providing of access from such street, were new.

On November 25, Munns appeared before the city council with an attorney and presented a letter declaring his ignorance of any alleged illegal subdivision, reciting his previous efforts to obtain a building permit, and containing this offer: "I therefore offer by this letter, to grant your city whatever is necessary up to twenty-five of my land, measured from the center line of Hidden Valley Road as it is existing, for the purposes of widening that road." The city attorney was delegated the task of preparing an agreement. The document thus drawn and presented to petitioner contains these recitals: "WHEREAS, the area commonly known as 'Hidden Valley' is an area reached by a roadway which is not a dedicated street; and WHEREAS, it is contemplated that a survey will be made to determine the proper and practical location of a street, together with public utilities, and that all of the abutting property owners in Hidden Valley will dedicate a sufficient portion of their property to create a dedicated street which will meet

the standards set up by the ordinances of the City of Monrovia, and that the necessary public improvements required by the ordinances of the City of Monrovia will be financed by the creation of an assessment district or districts.'' It also contains an agreement that the Munns property does not have the necessary 33 feet of frontage on a dedicated street ''with access for automobiles and other vehicles and for pedestrians provided to and from said dedicated street over said frontage of abutment;'' a further agreement to ''grant and dedicate'' to the city for street, public utility and related purposes ''sufficient land to complete same adjacent to their property after the location of the street into and through Hidden Valley has been determined;'' ''and Second Parties further promise and agree to sign any and all petitions, waivers, consents, and other papers necessary to improve said street under the Improvement Act of 1911, as amended, and the Special Assessment Investigation, Limitation and Majority Protest Act of 1931, as amended, or such other act as may be involved, and waive all right to protest against such improvement, but not the right to protest the amount or manner of spreading the assessment therefor if the same shall appear to them to bear inequitably or unfairly upon their property.'' This document contained the first and only reference to waiver of rights under the 1911 Improvement Act. In it the city agreed to issue a building permit, waive the 33-foot frontage requirement of ordinance Number 1200 and permit the use of Hidden Valley Road for ingress and egress. The proposed agreement significantly recites as one of its motivations the wish ''to avoid the expense and time involved in condemnation proceedings.'' In this connection, but some months later, Mr. Zapf told Munns that the people in the valley would have to dedicate a 40-foot strip of land, and that the preliminary studies to locate the center of the road would take about two years.

The proposed agreement not having been accepted, petitioner and his present attorney appeared before the city council on May 4, 1954, at which time City Manager Brady stated that ''[w]e would have to wait until the flood control program had been completed to that point which is just south of Latone,''—described as a major flood program for the area south of Latone (a street about 400 feet south of Munns' property). Brady denied making that statement but testified that that had been a part of the city's program. Also, ''[m]y position has been that the property should be legally subdivided before further development. Q. And by legal subdi-

vision, you have requested him to bring his property up to the standards which would be required if one were filing a subdivision proposal, isn't that correct? A. I think that is correct. Q. And that that would be true, that is to say, of the entire Hidden Valley area; everyone would have to bring their property up to the standards required of a subdivider? A. Yes.'' He further said that this would include a street as required by city ordinances, sewers as required for a subdivision, storm drainage facilities for the entire area, standard city water mains, fire hydrants, street lighting and standard size water mains, meaning larger ones than those then in place. He also testified that the following portion of the city's answer correctly sets forth its position: ''That the City Manager, the City Attorney, and the Respondents [appellants], have not refused to accept a dedication, provided that all improvements were in, including curbs, gutters, surface drainage, and provided that the said roads were properly surveyed and routed. That it was pointed out to the said Petitioners [respondents] by the said officials, that a survey was contemplated in the said Hidden Valley area for the road and planned such a road in collaboration with the various property owners and residents of said Hidden Valley area, but that said offers to dedicate could not be accepted on an uncoordinated piece-meal basis, and that the road should be located before accurate dedications could be made.'' Again he said, when asked how long it would take to do the necessary engineering and other work to complete the plan: ''Well, I know how long it will take to do the work, but a lot of it depends upon the people in the Valley, and I can't make any estimate on how long it will take them to decide what they want to do. Q. In other words, they have got to agree before the City is going to go forward at all, isn't that right? A. Oh, I think that is true, yes.'' The minutes of this meeting show that ''Mayor Walker asserted that permission could not be given to one and not to others. It was agreed that it was unfortunate that some owners were 'caught in the middle' but that further development of this area must wait due to the flood hazard until either the residents employ engineers to make a comprehensive survey or until the City's Engineering Department has time to do this work.'' A motion was carried ''to continue and sustain the action of the Council in denying building permits to residents of Hidden Valley. . . .'' Testimony of city officials plainly concedes that there was nothing about Munns' proposed improvement which, standing alone, would warrant denial of his application.

On March 29, 1954, Mr. Munns presented petitioner Lloyd's application for a permit and was told that no permits could be issued in that area. Lloyd's frontage is 209 feet on Hidden Valley Road.

As time went on the city's required conditions precedent to issuance of permits enlarged and grew no less vague. It was stated that flood and fire hazards must be first eliminated, adequate utilities, sewers, police and fire protection be provided,—all of which things were additional to the original demands. The trial judge found that denial of petitioners' applications for building permits was arbitrary and an abuse of discretion. It would have been difficult for him to reach any other conclusion.

Reliance upon ordinance 1200 is in vain. The city attorney in a written opinion which was read at the council meeting of May 4, 1954, said: ''The refusal was based upon the provisions of Ordinance No. 1200 of the City of Monrovia, which provides, among other things, that before a building permit may be issued, all of the laws of the City pertaining to zoning, subdivision, set-back lines, fire, and other laws, rules and regulations applicable to the property for which the permit is sought must be complied with.'' That ordinance obviously was passed in order to implement the unwritten policy which caused denial of Munns' initial application and in order to afford basis for repeated denials. The first refusal occurred on or prior to November 17, 1953, the date of first reading of the ordinance. ■ While it is generally true that such an application must conform to an ordinance passed while action upon the same is pending (*Brougher* v. *Board of Public Works*, 205 Cal. 426 [271 P. 487]), that rule seems not applicable to a situation in which the permit clearly should have been issued before amendment to the law. ''In this connection it is a significant fact that at the time this emergency ordinance was adopted petitioner has an application pending with the Zoning Administrator. Petitioner made application to the Zoning Administrator on September 1, 1945. The amending ordinance was adopted by the Council and signed by the Mayor on September 5, 1945. In *Vine* v. *Zabriskie*, 122 N.J.L. 4 [3 A.2d 886], it was held that where property was zoned for local business and apartment uses, an amendment to the zoning ordinance hastily adopted by the city commissioners after the owner had applied for a permit for the erection of apartment houses thereon, prohibiting the use of the property for that purpose, was an arbitrary interference

with the lawful and legitimate use of private property. (*Cf. Dubow* v. *Ross,* 175 Misc. 219 [22 N.Y.S.2d 610].) It would appear from the record before us that the emergency seems to have been petitioner's pending application." (*Bernstein* v. *Smutz,* 83 Cal.App.2d 108, 124 [188 P.2d 48].) See also, *Price* v. *Schwafel,* 92 Cal.App.2d 77, 84 [206 P.2d 683]. An annotation of this subject in 169 American Law Reports says, at page 585: "The rule that interim changes in the law affect the determination of pending applications for permits and licenses is not applied where the permit or license should have been issued prior to the change." Numerous citations there given support the text.[2] The least that can be said in this connection is that the passing of such an emergency ordinance in the circumstances shown at bar affords strong evidence in support of the trial court's finding of arbitrary action.

But our decision need not rest upon that ground. Ordinance 1200 is basically discriminatory, arbitrary and confiscatory, when applied to the property of petitioners or any other owners within the valley who had not built prior to the adoption of the ordinance. Munns' property has easy access to a sewer line, there is a fire hydrant close by, service is available for gas, electricity (light and power), domestic water supply, garbage collection; and the city furnishes fire and police protection. The ordinance would leave plaintiffs without the beneficial use of their property so long as others in the valley refuse to comply with the demands of the city for dedication of property for street use without compensation and the revamping of their lots and facilities to comply with requirements which would be imposed upon them if included in an entirely new subdivision. It was manifestly unreasonable to expect that those whose property was improved with a residence, outbuildings, driveways and landscaping would consent to any such exaction.

Cases such as *Coon* v. *Board of Public Works,* 7 Cal.App. 760, 762 [95 P. 913], are applicable. It was there held that an ordinance forbidding the issuance of a building permit for a livery stable without written consent of owners of property situated within 200 feet was unreasonable and void "because

---

[2] *Rubin* v. *Rockford,* 296 Ill.App. 650 [16 N.E.2d 607]; *Sgromolo* v. *Asbury Park,* 134 N.J.L. 195 [46 A.2d 661]; *Calton Court, Inc.* v. *Switzer,* (N. Y.) 221 App.Div. 799 [223 N.Y.S. 856]; *Re Reade,* (N.Y.) 58 N.Y.S.2d 390; *Fairchild Sons* v. *Rogers,* 266 N.Y. 460 [195 N.E. 154]; *Dubow* v. *Ross,* (N.Y.) 254 App.Div. 706 [3 N.Y.S.2d 862]; *Hauser* v. *State,* 113 Ohio St. 662 [150 N.E. 42, 44]; *State* ex rel. *Fairmount Center Co.* v. *Arnold,* 138 Ohio St. 259 [34 N.E.2d 777, 779, 136 A.L.R. 840].

it vests in private individuals the arbitrary power to determine whether the owner of real property may use it in the pursuit of a lawful occupation." (See also *Ex Parte Sing Lee,* 96 Cal. 354, 359 [31 P. 245, 31 Am.St.Rep. 218, 24 L.R.A. 195] ; *Hurst* v. *City of Burlingame,* 207 Cal. 134, 142-143 [277 P. 308].)

It is plainly apparent that ordinance 1200 contains requirements which can never be met and that it would completely destroy the use and value of petitioner's property if upheld. The assertion that this was an exercise of the police power cannot survive scrutiny. *Pennsylvania Coal Co.* v. *Mahon,* 260 U.S. 393 [43 S.Ct. 158, 67 L.Ed. 322, 28 A.L.R. 1321] is apposite. The coal company had sold land with an express reservation of the right to remove the underlying coal, "and the grantee takes the premises with the risk, and waives all claim for damages that may arise from mining out the coal." (P. 412.) A statute subsequently passed forbade the mining of coal in such a way as to cause subsidence of any structure used as a habitation. "As applied to this case, the statute is admitted to destroy previously existing rights of property and contract. The question is whether the police power can be stretched so far." (P. 413.) Mr. Justice Holmes said at pages 415-416: "The general rule, at least, is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. . . . We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. As we already have said, this is a question of degree— and therefore cannot be disposed of by general propositions. But we regard this as going beyond any of the cases decided by this court."

*Rose* v. *State,* 19 Cal.2d 713, 730 [123 P.2d 505] : "While it is true that the seeming absolute protection against the taking or damaging of private property for public use provided for in section 14 of article I of our Constitution may be qualified by the police power in the area in which such power operates, it should be obvious that the police power doctrine cannot be invoked in the taking or damaging of private property in the construction of a public improvement where no emergency exists. To hold otherwise would in effect destroy the protection guaranteed by our Constitution against the taking or damaging of private property for a public use without compensation. (*Gray* v. *Reclamation Dist. No. 1500,*

174 Cal. 622 [163 P. 1024] ; *Pennsylvania Coal Co.* v. *Mahon,* 260 U.S. 393 [43 S.Ct. 158, 67 L.Ed. 322].)'' To the same effect see : *Bernstein* v. *Smutz, supra,* 83 Cal.App.2d 108, 117 ; *City of Los Angeles* v. *Aitken,* 10 Cal.App.2d 460, 468 [52 P.2d 585] ; *Jones* v. *City of Los Angeles,* 211 Cal. 304, 320-321 [295 P. 14].

The fulcrum upon which all the city's contentions rest is the claim that the Hidden Valley residential area is the flowering of an illegal subdivision. The trial judge found ''that there is no evidence or proof of violation of any of the subdivision laws of this state, or any of the ordinances or laws of the city of Monrovia in the selling of said parcels of land by metes and bounds by predecessors of Lloyds and Munns; and the court finds that the allegations of Respondents [appellants] that Hidden Valley has been subdivided illegally and surreptitiously is not true. The court further finds that petitioners Lloyds and Munns have never owned property in Hidden Valley other than their above mentioned parcels, and they had no knowledge of and did not participate in the selling and transferring of any other parcels of land in Hidden Valley by metes and bounds description, or otherwise; and the court further finds that even if other parts of Hidden Valley had been subdivided illegally, or were sold by metes and bounds parcels illegally, that it is arbitrary, discriminatory, and unreasonable to deny said petitioners the right to use their parcels of real property for residential structures by reason of said alleged illegal subdivision or sale.'' This last conclusion is eminently sound. The subdivision statutes and ordinances prescribe penalties for violation of their requirements. None of them suggests that an innocent third party may be deprived of the use of his property because he buys into an illegally subdivided tract. Section 11541, Business and Professions Code, makes violation of the act a misdemeanor. Section 11542 authorizes a suit at the instance of the municipality to enjoin any proposed subdivision or sale in violation of the statute. Section 11540 renders voidable, at the option of the buyer, any contract, sale or deed made contrary to the statute. This law having been made for the protection of a class to which he belongs the purchaser is not *in pari delicto* and may recover his money if so advised. (*Smith* v. *Bach,* 183 Cal. 259, 263 [191 P. 14] ; *Murphy* v. *San Gabriel Mfg. Co.,* 99 Cal.App.2d 365, 368 [222 P.2d 85] ; *Clemons* v. *City of Los Angeles,* 36 Cal.2d 95, 105 [222 P.2d 439].)  If it were a fact that Hidden Valley was subdivided in a manner con-

trary to statute or ordinance, that would not afford basis for the city's refusal to permit the owner of a lot therein to beneficially enjoy it by constructing a residence.

Appellants challenge as unsupported by the evidence the court's findings, (1) that Cloverleaf Road and Hidden Valley Road are dedicated public streets through adverse public user, (2) that petitioners' properties were "mapped as R-1 property" under city zoning ordinances, (3) that the city is estopped to deny permits to petitioners; also that the court erred in failing to find whether the property conforms to the subdivision requirements of ordinance 1200. ■ The contention of insufficiency of the evidence imposes upon appellants an obligation "to demonstrate that there is no substantial evidence to support the challenged findings." (*Nichols* v. *Mitchell*, 32 Cal.2d 598, 600 [197 P.2d 550].) This they have failed to do. What we have said herein renders the further canvassing of any of these questions a mere work of supererogation. The fundamentally unreasonable and arbitrary action of the city in denying building permits to petitioners renders each of these last mentioned issues legally inconsequential.

For the first time appellants raised on appeal the point that the trial court exceeded its jurisdiction in conducting a hearing de novo. It is said that this mandamus proceeding is one in which the hearing should have been confined to the record made before the administrative agency and that, as the matter is jurisdictional, appellants' failure to make any objection in the trial court does not waive it.

At the opening of the trial the city attorney said: "I feel that before any testimony should be taken that the premises out there should be viewed by the Court," and his opponent: "[W]e would join in the request that the Court does view the premises, and we would be willing to receive any suggestions the court might have as to how we would go there and meet and so on." It was thereupon agreed between court and counsel that the judge should view the premises and take testimony on the ground before any other proceedings would be taken in the case. This was done; the record of the viewing of the area and the testimony there taken occupies pages 4-44 of the reporter's transcript. The hearing was then adjourned to the courtroom and comprised the rest of the 518 page transcript. No suggestion was made at any time by any person that this was a case which should be tried differently from any other civil action, or that the court should be limited to

consideration of what took place before the building department or the city council, or both of said agencies. If there was an absence of jurisdiction in the absolute sense, such as occurs when a court tries a case over which it has no jurisdiction whatever, appellants' argument doubtless would be sound. But if we have any jurisdictional defect here it is of a procedural nature, such as is mentioned in *Abelleira* v. *District Court of Appeal*, 17 Cal.2d 280, 288, 291 [109 P.2d 942, 132 A.L.R. 715] ; the court there describes as a jurisdictional defect an act done ''without the occurrence of certain procedural prerequisites,'' and refers to ''procedural rules originally devised for convenience and efficiency and by precedent made mandatory and jurisdictional.''

Appellants' contention invokes the procedural rule expressed in section 1094.5, Code of Civil Procedure, which section was intended as a codification of rules previously evolved by the Supreme Court for review of decisions of administrative agencies. (See *Temescal Water Co.* v. *Department of Public Works*, 44 Cal.2d 90, 105 [280 P.2d 1].)

The petition at bar makes no suggestion that it was filed pursuant to section 1094.5 and no such claim was made at the trial; but whether it was or not seems immaterial, for the Supreme Court has repeatedly held that regardless of section 1094.5 there can be no trial de novo in a mandamus proceeding which attacks administrative action if the situation is one in which a right to hearing exists as a matter of due process or other general law. (*Fascination, Inc.* v. *Hoover*, 39 Cal. 2d 260, 270-271 [246 P.2d 656] ; *Simpson* v. *City of Los Angeles*, 40 Cal.2d 271, 282 [253 P.2d 464] ; *Livingston Rock etc. Co.* v. *County of Los Angeles*, 43 Cal.2d 121, 128-129 [272 P.2d 4] ; *Nathan H. Schur, Inc.* v. *City of Santa Monica*, 47 Cal.2d 11, 16 [300 P.2d 831] ; *Damiani* v. *Albert*, 48 Cal.2d 15, 16-17 [306 P.2d 780].) But this rule does not apply where no hearing or taking of evidence is required. (*Keeler* v. *Superior Court*, 46 Cal.2d 596, 599 [297 P.2d 967] ; *Di Genova* v. *State Board of Education*, 45 Cal.2d 255, 260, 262, 263 [288 P.2d 862].) Stating the matter in a different way, it does not apply to mandatory ministerial acts or quasi-legislative ones. (*Di Genova* v. *State Board of Education, supra*; *Brock* v. *Superior Court*, 109 Cal.App.2d 594, 598-601 [241 P.2d 283] ; *Temescal Water Co.* v. *Department of Public Works, supra*, at p. 100.)

The city's building ordinance (No. 1190) which was in effect prior to December 1, 1953, incorporated by reference the

Uniform Building Code of Pacific Coast Building Officials Conference (1952 edition) and contains no provision for a hearing upon the granting or denial of a permit. (Section 204 of the Uniform Code creates a board of appeals, but it has no such function.) No state law contains any such requirement so far as we are aware. In response to the contention that petitioner was entitled to notice and a hearing upon adoption of ordinance 1200, the city attorney argued that it is a building code and not a zoning ordinance and hence there was no right to a hearing. Of course, the fact that some sort of hearing was held is immaterial, for it is the right to a hearing and the taking of evidence which controls the question of trial de novo.

█ The duty imposed upon the building department is ministerial and mandatory. Upon refusal to discharge it the form of mandamus existing independently of section 1094.5 may be invoked and it is not confined to a review of a record made by an officer who has held no hearing and has no duty to do so. Moreover, the requirement that the hearing upon such a mandate proceeding be limited to the record below cannot be applied logically to an officer who has refused to act and made no record other than the bald fact of refusal.

It having been held herein that ordinance Number 1200 is invalid because unreasonable, arbitrary and discriminatory, pursuit of the question whether it impliedly calls for a hearing of the various questions raised by its section 6.1 (quoted *supra*) becomes unnecessary.

█ If it were to be conceded that a hearing was required in the present instance that would bring us back to the argument that the excess of jurisdiction consists of a departure from the procedural rule forbidding a trial de novo. Assuming that there was such a jurisdictional defect, it was waived when the city attorney opened the case by inviting and stipulating to a view of the premises by the judge and the taking of evidence at that place. The waiver would be one effected by estoppel. █ Applicable here is the rule that parties to an action over which the court has general jurisdiction cannot be heard to claim lack of power to try a particular issue after they have consented to a trial thereof and have participated in the same.

The rule is exemplified by divorce cases wherein the court has canvassed issues relating to the husband's separate property. (*Allen* v. *Allen,* 159 Cal. 197, 201 [113 P. 160]; *Glass* v. *Glass,* 4 Cal.App. 604, 608 [88 P. 734]; *Citizens Nat.*

*T. & S. Bank* v. *Hawkins,* 87 Cal.App.2d 535, 542 [197 P.2d 385] ; *Spahn* v. *Spahn,* 70 Cal.App.2d 791, 795-796 [162 P.2d 53].) *Schlyen* v. *Schlyen,* 43 Cal.2d 361, 377 [273 P.2d 897], holds that the so-called lack of jurisdiction of an equity court to try a controversy between the heirs and the personal representative of a decedent's estate is not such in reality, and that although the trial should be had on the probate side, failure to object at the hearing is fatal to a later claim of lack of jurisdiction based upon that ground.

1 Witkin, California Procedure, page 387, section 123, says: ''Most procedural steps, including those which are regarded as 'mandatory,' are not jurisdictional. Errors or omissions in compliance with them are not fatal to the fundamental subject matter jurisdiction of the court (see *supra,* §§ 49, 50) nor to its jurisdiction to act.'' At page 412, section 148(b) : ''If, as suggested above, the jurisdictional defect is not serious enough to justify collateral attack, it would seem to follow that the aggrieved party can lose his right to attack the judgment or order by affirmative conduct amounting to consent or estoppel. This is not to say that jurisdiction to act beyond its authority can be 'conferred' on a court, but rather that a party, by seeking certain action by the court, may be precluded from objection afterwards to the action taken. . . . [§ 149.] There seems to be substantial authority for the proposition that a party who has invoked or consented to the exercise of jurisdiction beyond the court's authority may be precluded from challeging it afterwards, even on a direct attack by appeal.'' Volume 31, American Jurisprudence, section 432, page 92: ''The circumstances of a particular case may be such as to estop a person from setting up the invalidity of a judgment.'' Cited in support of the text is *Guardianship of Di Carlo,* 3 Cal.2d 225 [44 P.2d 562, 99 A.L.R. 990]. That opinion says, at page 228: ''Many authorities attest the rule that a guardian who has procured his own appointment is estopped from denying, and will not be heard to deny, the jurisdiction of the court, by the order of which his appointment was made.''

Although it is not clear that the point now under discussion was argued by counsel, the court in *Sindell* v. *Smutz,* 100 Cal. App.2d 10 [222 P.2d 903], a mandamus proceeding directed at a zoning administrator, said at page 15: ''The trial judge, on stipulation of the parties, viewed District 19 and all of the surrounding areas. The conditions he observed and the knowledge he gained constitute independent evidence which he had a right to consider in determining the issues involved.''

█ We hold that there was no jurisdictional defect and no error in the conduct of a full hearing at the instance and upon the stipulation of appellants' attorney; that if there had been such the appellants are estopped to complain of it. The doctrine of invited error (see 4 Cal.Jur.2d § 556, p. 420) applies.

Another contention of appellants is that the trial judge disregarded the rule as to burden of proof applicable to a mandamus proceeding. It is urged that affirmative allegations of the answer must be taken as true unless controverted by pleading or proof of petitioner (Code Civ. Proc., § 1091; 32 Cal.Jur.2d § 66, p. 269; *Kimberlin* v. *Los Angeles City High Sch. Dist.*, 115 Cal.App.2d 459, 464 [252 P.2d 344] ), and that petitioners offered no evidence to refute certain allegations of defendants' answer which the court found to be untrue. The argument centers upon the claims that plaintiffs' properties were parts of an illegal subdivision, that dangers of fire and flood warranted denial of the permits, that the provisions of section 6.1 of ordinance Number 1200 had not been complied with, that Cloverleaf Road and Hidden Valley Road are not dedicated public streets. All of these claims being excuses for failure to issue the permits, it seems that the burden rested upon defendants. (*Wyckoff* v. *Force*, 61 Cal.App. 246, 250 [214 P. 489] ; 32 Cal.Jur.2d § 71, p. 277.) Be that as it may, the foregoing discussion discloses that these issues became immaterial in the light of the invalidity of ordinance Number 1200 and the arbitrary action of the city officials in denying permits as a means of coercing action on the part of all property owners within the area. █ Error in an immaterial finding, if found to exist, cannot work a reversal. (24 Cal.Jur. § 187, p. 942.)

No other issues require discussion.

Judgment affirmed.

Moore, P. J., and Fox, J., concurred.

A petition for a rehearing was denied August 13, 1957, and appellants'. petition for a hearing by the Supreme Court was denied September 11, 1957.