[Civ. No. 16210. Third Dist. June 3, 1977.]

INTERNATIONAL MOLDERS AND ALLIED WORKERS UNION,
LOCAL 164, AFL-CIO, Petitioner, v.
THE SUPERIOR COURT OF SAN·JOAQUIN COUNTY,
Respondent;
LODI IRON WORKS, INC., Real Party in Interest.

## COUNSEL

Van Bourg, Allen, Weinberg & Roger and David Rosenfeld for Petitioner.

No appearance for Respondent.

Littler, Mendelson & Fastiff, Littler, Mendelson, Fastiff & Tichy and Randolph C. Roeder for Real Party in Interest.

## OPINION

PARAS, J.—On April 15, 1976, after failure of negotiations to renew a collective bargaining agreement, petitioner International Molders and Allied Workers Union, Local 164 (hereinafter Molders) commenced a strike against real party in interest Lodi Iron Works (hereinafter Lodi) of Lodi, California. Peaceful picketing took place until the morning of May 4, 1976, when Lodi placed an advertisement in the local newspaper stating that foundry workers were needed at its plant. On that date the number of pickets dramatically increased.

On May 5, 1976, Lodi filed a complaint for injunction, seeking to enjoin Molders and its members from engaging in illegal picketing activities. After written and telephone notice on May 5 and 6 to Molders and its attorneys, and after the judge himself telephoned the office of the attorney for Molders and established that no appearance would be made, the court on May 6, 1976, issued a temporary restraining order, and an order to show cause which it set for hearing on May 20, 1976.

On May 19, 1976, counsel for Lodi sent a telegram to the court, stating: "Counsel for the defendant Union, Victor Van Bourg, and I have agreed to a one week continuance of the hearing on the preliminary injunction in this matter, continuing the hearing and the temporary restraining order to Thursday, May 27, 1976, at 9:00 o'clock AM. Mr. Van Bourg is exercising the defendant's statutory right to one continuance as a matter of right. A copy of this telegram is being sent to Mr. Van Bourg." The matter was continued pursuant to this request.

On May 21, 1976, Van Bourg sent a letter to the clerk of the court stating: "This will confirm our telephone call to your office today, indicating that by agreement of the parties, [this case and two unrelated cases in which Molders and Lodi were involved] ... have been continued to Friday, *May 28, 1976 at 9:00 A.M.*" (Italics in original.)

On May 28, 1976, the matter was argued, and the court granted the preliminary injunction.

On June 3, 1976, Lodi filed a declaration by Ralph Fuller, its plant superintendent, alleging 63 violations (hereinafter sometimes referred to as counts) of the temporary restraining order. Pursuant to this declaration, the court ordered Molders and four of its individual members to show cause on June 14, 1976, why they should not be held in contempt of the temporary restraining order. On June 14, 1976, the matter was continued to June 22, 1976. On June 16, 1976, Lodi filed a supplemental declaration by Fuller, alleging 45 violations of the preliminary injunction. The court issued another contempt order to show cause to Molders and seven of its members, and set this hearing also for June 22, 1976.

Trial on the first order to show cause was held on June 22 and 23, 1976, and continued to June 29, 1976, at which time the court heard testimony relative to the second order to show cause. On July 1, 1976, the court found Molders guilty of four violations of the temporary restraining order, and fined it $250 on each, for a total of $1,000. On August 19, 1976, the court found Molders guilty of 15 violations of the preliminary injunction, and also found that 6 named individuals had committed specific violations. Molders was fined $250 per violation, for a total of $3,750; and the individuals were ordered to serve five-day jail sentences on each violation, some of which were suspended, with the result that four of the six were actually ordered to serve time in jail. The court stayed enforcement of the sentences for 10 days.

In the meantime, on August 10, 1976, Molders filed a petition for writ of certiorari in this court, seeking a stay and a review of the contempt citations on the temporary restraining order. We issued a stay order on August 12, 1976, and a writ of review on September 14, 1976. On September 2, 1976, the six individuals found in contempt of the preliminary injunction filed in this court a petition for writ of habeas corpus. We treated this petition as one for certiorari and issued a stay order on September 2, 1976; on September 28, 1976, we consolidated the latter case (3 Civ. 8892) with the earlier writ of review (3 Civ. 16210).[1]

## The Temporary Restraining Order

With respect to the contempt judgments arising out of the temporary restraining order, Molders makes four arguments:

1. The temporary restraining order violated Code of Civil Procedure section 527.3.

2. The temporary restraining order expired on May 20, 1976, before any of the violations occurred.

3. The judgments of contempt are not supported by substantial evidence.

4. The declaration initiating the contempt charges failed to give adequate notice to Molders to enable it to prepare a defense.

I

The temporary restraining order of May 6, 1976, inter alia, restrained Molders from: "Physically obstructing in any manner any entrance to or exit from, plaintiff's premises; in this regard, there shall not be more than two (2) pickets within 20 feet of any entrance or exit to the premises." Molders contends that this paragraph of the order violates Code of Civil Procedure section 527.3, enacted September 29, 1975

---

[1] A third petition (for a writ of certiorari) was filed on September 10, 1976, seeking review of the $3,750 in fines against Molders for violations of the preliminary injunction. (3 Civ. 16287.) We issued a stay, but after receipt and consideration of opposition, denied the petition on September 29, 1976. Thereafter review was sought in the Supreme Court, which on October 28, 1976, denied the petition.

(Stats. 1975, ch. 1156) and effective January 1, 1976.[2] It argues that "[t]he purpose of C. C. P. § 527.3 was without a doubt to prohibit such restrictions upon numbers, as long as those numbers are peaceful."

The statute provides in pertinent part:

"(b) . . . no court . . . shall have jurisdiction to issue any restraining order or preliminary or permanent injunction which . . . prohibits . . . .

". . . . . . . . . . . . . . . . . . .

"(2) *Peaceful* picketing or patrolling involving any labor dispute, whether engaged in singly or in numbers.

". . . . . . . . . . . . . . . . . . .

"(e) It is not the intent of this section to permit conduct that is unlawful including breach of the peace, disorderly conduct, the unlawful blocking of access or egress to premises where a labor dispute exists, or other similar unlawful activity." (Italics added.)

The law enunciated in section 527.3 does not in our view differ from case law in this area, as most recently summarized in *United Farm Workers of America* v. *Superior Court* (1976) 16 Cal.3d 499 [128 Cal.Rptr. 209, 546 P.2d 713], and *California Retail Liquor Dealers Institute* v. *United Farm Workers* (1976) 57 Cal.App.3d 606 [129 Cal.Rptr. 407]. In these cases, both of which involved the same labor dispute, the California Retail Liquor Dealers Institute had obtained a *class* injunction on behalf of its 2,000 members against the United Farm Workers Union, which limited the union's picketing activities (in protest against Gallo products sold in members' liquor stores) to three pickets at each driveway and store entrance, not less than six feet therefrom, and not directly in front thereof. The injunction was based upon declarations of the institute's members that union pickets had massed in front of their entrances so as to prevent the public from entering, and had engaged in acts of violence and property damage.

Our Supreme Court held that the plaintiffs had "failed to establish the requisite community of interest to support a class action" (16 Cal.3d at

---

[2]California Constitution, article IV, section 8: ". . . a statute enacted at a regular session shall go into effect on January 1 next following a 90-day period from the date of enactment of the statute . . . ."

p. 505), because the declarations failed to show that illegal activities had occurred at every member's store or even that all of the members sold Gallo products. The court went on to state: "It is well established, of course, that such unlawful labor activities as violence, intimidation and obstruction properly may be enjoined by the courts. In *United Farm Workers Organizing Committee* v. *Superior Court, supra,* 4 Cal.3d 556 [94 Cal.Rptr. 263, 483 P.2d 1215], wherein we cautioned against broad injunctions limiting 'legitimate activities of industrial combatants' (pp. 569-570) we also pointed out that 'Needless to say, nothing in this opinion should be construed as prohibiting a court from enjoining violence, activity which contains threats of injury, violence or reprisals, activity which creates public safety hazards, or activity which obstructs ingress and egress to buildings or stores.' (P. 572, fn. 30.) Indeed, it has long been the rule that courts have the power and the duty to enjoin acts of violence and intimidation. 'Labor has no sanctuary in any federal right when it departs from the bounds of peaceful persuasion and resorts to acts of violence, physical intimidation, or false statement. Under such circumstances, picketing loses it character as an appeal to reason and becomes a weapon of illegal coercion.' " (16 Cal.3d at pp. 505-506.)

After the Supreme Court's opinion, the Court of Appeal considered the validity of the injunction as to the named individual plaintiffs. It found the restrictions on picketing justified in light of the record, stating:

"UFW's only objection to the injunction as it applies to the individual plaintiffs is that it sets forth number and distance restrictions on the mode of picketing. UFW relies on *Davis* v. *Francois* (5th Cir. 1968) 395 F.2d 730, 735, where an ordinance limiting the number of pickets to two regardless of time, place and circumstances was held invalid. However, as the United States Supreme Court explained in *Drivers Union* v. *Meadowmoor Co., supra,* 312 U.S. at pp. 292-293 [85 L.Ed. at pp. 840-841], a court order fashioned according to the circumstances of the case generally stands on a different footing from statutes which define the permissible scope of free speech activities in the abstract. The present record adequately justifies the restrictions imposed by the trial court. Pickets had blocked entrances and driveways and had harassed and intimidated customers of the boycotted stores. The declarations reveal a pattern of unlawful activity. On the other hand, it does not appear that the number and distance restrictions will impede peaceful informational picketing; *the restrictions are not so severe that the union would be unable to communicate its grievances effectively to patrons of the picketed stores.* (Cf. *In re Berry, supra,* 68 Cal.2d at p. 154 [65 Cal.Rptr. 273, 436 P.2d

273]; *Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766, 770-771 [40 Cal.Rptr. 233, 394 P.2d 921]; *N. W. Pac. R. R. Co.* v. *Lumber & S. W. Union, supra,* 31 Cal.2d at p. 447 [189 P.2d 277].)" (Italics added.) (57 Cal.App.3d at p. 611.)

 As it has ever been, the only legitimate objective of picketing thus continues to be the transmission of information to the public, so that the public may know the picketers' grievance and elect to support or reject it. Far from repudiating this objective, section 527.3 reaffirms it. As to the phrase, "whether . . . singly or in numbers" in subdivision (b)(2), it is merely descriptive of the picketing activity which the statute condones and which is commonly carried on by more than a single picket.

Two declarations were filed by Lodi in support of the temporary restraining order. The first, by plant superintendent Fuller, stated: "On the morning of May 4, 1976, the Company placed an article in a local newspaper stating that foundry workers were needed at Lodi Iron Works, which was presently under strike conditions. The ad listed the positions that were needed and indicated that interested persons could apply at the foundry or call for more information.

"On May 4, 1976, at approximately 9:00 A.M., 20 to 30 pickets massed in front of the small office door through which applicants for employment would have to pass. The pickets were not moving but were rather standing in bunches making ingress into the building extremely difficult, if not impossible.

"This picketing lasted throughout the day with the numbers starting to fade at approximately 5:00 P.M. Picketing was down to about five people by 6:30 P.M. During this time, approximately 25 persons made it through the pickets in order to apply for employment. However, approximately 50 to 100 people were turned away by the pickets throughout the day.[3]

" . . . . . . . . . . . . . . . . . .

"On May 5, at 6:45 A.M., there were approximately 50 pickets in the area. There were approximately 18 pickets standing in front of the office door while the rest of the pickets were around the shop gate. This

---

[3] We omit *certain* hearsay statements which relate what some applicants for employment told Fuller the pickets had said to them.

picketing lasted until approximately 10:20 A.M. when the crowd began to thin out.

"After 10:20 A.M. there were approximately 12 pickets in front of the office, 12 in front of the gate, and ten to the north of the office. These pickets are not marching but rather are just standing in bunches.

"In the morning when there were approximately 50 pickets, the pickets were spilling out into the street, blocking the street. Cars trying to get through had to stop in order to weave their way through the pickets. I also saw one person who was surrounded by pickets. During the morning I also saw two or three of the pickets carrying baseball bats."

The second declaration was by Melvin Williams, a 20-year-old applicant for employment. He stated: "On Wednesday, May 5, 1976, at approximately 10:00 A.M., I went to the Lodi Iron Works, located at 820 South Sacramento Street, Lodi, California, to seek employment. My father went with me because both of us are unemployed at the present time and we need work.

"When we arrived at the Lodi Iron Works, we discovered that there was a great mob of pickets right in front of the main office. Because I was going to the Company to apply for employment, I had to go into the business office first. As my father and I approached the door into the business office, we were confronted by two or three of the pickets, one of whom was carrying a two foot long black wire-hose. He was holding the hose in a very threatening manner and I was afraid that he might use it on me. I did not say anything and after a few seconds, he and the other two men got my father and started to talk to him. I then proceeded to the door but suddenly, five other pickets ran over and stood in front of me. I am only about 5 feet 10 inches tall, and most, if not all, of these men were over 6 feet tall and much heavier than I am. All of them had wrenches and they acted as if they were going to use them on me. One of these men, who stood right between me and the door, said 'We are not going to let you in.' One of the other men was yelling "Hit him, hit him!" Needless to say, I did not enter but I turned around and left immediately.

"I am certain that if I had not left, I would have been physically assaulted by the pickets. I know that these men were pickets because they had numerous picket signs which identified them as being from Local 164 of the Molders Union. There were at least twenty or thirty

pickets at the time, and they were all mobbed right in front of the entrance into the business office."

■ These declarations adequately supported the trial court's restraining order limiting to two the number of pickets within twenty feet of any entrance or exit. The order permitted any number of pickets to be present outside the 20-foot perimeter. Such a restriction allowed Molders to continue to show the strength of its convictions by fielding a large number of pickets, but provided a reasonable distance to permit ingress and egress and minimize physical confrontations. Molders will not be heard to complain because the order prevented it from abusing its time-honored and universally respected right to picket *peacefully*. ■ Nothing in section 527.3, subdivision (b), prevents a court from placing reasonable restrictions on picketing where, as here, the absence of such restrictions has resulted in threats of violence and interference with access and with freedom of movement. (See also *In re Coleman* (1974) 12 Cal.3d 568, 572 [116 Cal.Rptr. 381, 526 P.2d 533]; *San Diego Gas and Elec. Co.* v. *San Diego Congress of Racial Equality* (1966) 241 Cal.App.2d 405, 407 [50 Cal.Rptr. 638] (upholding numerical restrictions on picketing).) The temporary restraining order was valid.

## II

■ Molders argues that the temporary restraining order expired on May 21, 1976, "because Code of Civil Procedure § 527 imposes a fifteen-day limit on such injunctions unless otherwise ordered by the court." It contends that only the *order to show cause* was continued to May 28, 1976; that no stipulation continuing the restraining order was filed, and there is nothing to indicate that it continued in effect.

The argument is disingenuous. Molders does not assert that the telegram from Lodi's attorney to the court on May 19, 1976, failed to reflect the understanding of Molders' counsel. On its face the telegram recites an agreement to continue ". . . the hearing *and the temporary restraining order* to Thursday, May 27, 1976 . . . ." (Italics added.) The minutes of the court also reflect an order continuing the *temporary restraining order* as well as the order to show cause. Nor does Molders deny that its counsel requested the continuance as a matter of right, pursuant to Code of Civil Procedure section 527, which provides: "The defendant . . . shall be entitled, as of course, to one continuance for a reasonable period, if he desire it, to enable him to meet the application for the preliminary injunction."

Perhaps because it would so obviously defeat the purpose of section 527 to give defendant a right to a continuance without also giving plaintiff a concurrent and automatic extension of the temporary restraining order, we find no authority in which that question was directly discussed. In any event, it is apparent that the 15-day limitation is for the protection of the restrained defendant, to enable him to contest the allegations at an early date. By requesting a continuance beyond the 15 days, Molders waived this protection. Plaintiff was powerless to prevent the continuance. The matter was thereafter heard by the court without any objection or claim of defective proceeding. Under such circumstances, Molders is estopped to assert the 15-day limitation.

This holding is supported by *West Coast Constr. Co.* v. *Oceano Sanitary Dist.* (1971) 17 Cal.App.3d 693 [95 Cal.Rptr. 169], in which the defendant contended for the first time on appeal that the injunction was invalid, "because the order to show cause, dated December 8, was made returnable on December 24; 16 days later and, therefore, more than the 15 days prescribed in section 527 . . . ." (17 Cal.App.3d at p. 698.) After four appearances and four continuances of the hearing on the return of the temporary restraining order, the matter had finally been heard on January 15, when a preliminary injunction was issued. The Court of Appeal rejected defendant's claim of invalidity, relying partly on the doctrine of estoppel: " 'There seems to be substantial authority for the proposition that a party who has invoked or consented to the exercise of jurisdiction beyond the court's authority may be precluded from challenging it afterwards, even on a direct attack by appeal.' (1 Witkin, Cal. Procedure (1954) § 149, p. 412.) Too, as pointed out in *Remillard Brick Co.* v. *Dandini,* 47 Cal.App.2d 63, 66 [117 P.2d 432], the requirements of the statute (§ 527) are primarily for the benefit of the defendant and may be waived by him. In general accord is *Munns* v. *Stenman,* 152 Cal.App.2d 543, 558 [314 P.2d 67]: ' "The circumstances of a particular case may be such as to estop a person from setting up the invalidity of a judgment." [Citation.]' " (17 Cal.App.3d at p. 699.)

The additional one-day continuance from May 27 to May 28, by agreement of the parties, is subject to the same analysis. Molders may not complain that it was not afforded the 15-day protection of section 527 where it requested and obtained a continuance of the hearing beyond that time.

## III

Molders argues that the contempt judgments are not supported by substantial evidence. In announcing its decision in open court, the trial court prefaced its findings with the statement that it was not holding Molders in contempt for violations occurring early in time, but "in view of their [sic] participation of the international officers and the shop steward and the fact that they were in touch with each other, that it was a Union-sanctioned strike, I cannot see how they can escape responsibility for continuous conduct of the same variety." It then found Molders guilty of counts 40 and 41 (treated as a single violation), 47, 53, and 59.

In reviewing the evidence, we are of course bound to accept the evidence favorable to the judgment as true, and to disregard any contrary evidence. (*In re Coleman, supra,* 12 Cal.3d at p. 572; *Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384].) Applying the foregoing standard, we have carefully reviewed the evidence supporting each count and have found it sufficient. There is no need to review such evidence in detail.

## IV

Petitioner's final contention with respect to the temporary restraining order is that Molders was not given adequate notice of the individuals who allegedly acted as its agents (particularly with respect to count 40) and thus was not adequately prepared to present its defense.

The record belies this contention. The supporting declaration avers as to count 40 (as well as all other counts) that the strikers "were acting at the direction of and in combination with authorized officers and agents of defendant Local 164 . . . ." On the day set for trial of the contempt proceedings, Molders requested and obtained an eight-day continuance. At the trial, Lodi's counsel made available to Molders' counsel all notes, reports, records and information in their possession regarding the charges. Lodi also agreed at trial to a further continuance after its case was fully presented, to allow further preparation by Molders to cross-examine Lodi's witnesses and to present other testimony.

No authority is cited for the claim that the name of each striker involved in count 40 had to be stated in the supporting declaration, and we know of no such specific requirement. Molders was adequately

informed of the charges and had every opportunity to prepare and fully present its defense.

## The Preliminary Injunction

Petitioners in the habeas corpus proceeding[4] make five arguments with respect to the contempts arising out of the preliminary injunction.

a. Petitioners were entitled to a jury trial.

b. The preliminary injunction was invalid.

c. Petitioners had no notice of the preliminary injunction.

d. There is no substantial evidence to support the judgments of contempt.

e. The court failed to recite the specific provisions of the injunction which were violated.

### A

■ The trial court properly denied petitioners' demand for a jury trial. It has long been established that a defendant in a civil contempt proceeding does not have a right to a jury trial. (*Bridges* v. *Superior Court* (1939) 14 Cal.2d 464 [94 P.2d 983].) This principle has never been overruled and has consistently been followed. (*Hawk* v. *Superior Court* (1974) 42 Cal.App.3d 108, 133, fn. 25 [116 Cal.Rptr. 713]; *Pacific Tel. & Tel. Co.* v. *Superior Court* (1968) 265 Cal.App.2d 370, 375 [72 Cal.Rptr. 177]; *United Farm Workers, AFL-CIO* v. *Superior Court* (1968) 265 Cal.App.2d 212, 214 [71 Cal.Rptr. 513].)

### B

■ Petitioners' contentions with respect to the invalidity of the preliminary injunction are without merit. At the conclusion of the hearing on May 28, at which time the court granted the preliminary injunction, the court instructed counsel for Molders to make certain changes in the form of order which had earlier been prepared for the

---

[4]The petitioners are Ignacio Monroy, Gary Mietz, Donato Zavala, Charles Johnson, Tony Hinojosa, and Antonio Barba.

judge's signature. Counsel complied and caused the final preliminary injunction form to be prepared; it was then signed and filed by the judge (in the absence of Lodi's counsel). The injunction made no reference to a bond. (Code Civ. Proc., § 529.) Later that same day, Lodi's counsel checked the file to determine the amount of bond he should post and noted the missing provision. He called it to the judge's attention, who then inserted a handwritten $500 bond requirement into the injunction. The requisite bond was posted forthwith. A copy of the preliminary injunction as amended was then served by mail upon Molders' counsel and personally upon various members of Molders. It is undisputed that the injunction form which lacked the bond provision was never served upon anyone.

Petitioners' argument is that the injunction without the bond requirement is invalid, and the ex parte addition thereof is a violation of due process. Petitioners overlook the obvious, that the absence of the bond provision from the order as originally signed was a clerical inadvertence; the judge had the power to correct it and to cause the injunction to reflect his true direction and intention. "The court may, upon . . . its own motion, correct clerical mistakes in its judgment or orders as entered, so as to conform to the judgment or order directed . . . ." (Code Civ. Proc., § 473. See also 1 Witkin, Cal. Procedure (2d ed. 1970) Jurisdiction, § 222, p. 755; 4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, §§ 66-69, pp. 3228-3232.) The record reflects such action and nothing more. There is no due process issue.

We note parenthetically that although the injunction was immediately served upon Molders' counsel (who does not anywhere deny knowledge of the bonding requirement or its amount), at no time did counsel request an increase in the amount of bond despite innumerable opportunities to do so. As counsel now suggests in his brief to this court, Molders had every right to suggest that the amount of the bond be substantially higher than $500. But the failure so to do demonstrates a complete lack of concern about the amount of bond and an acceptance thereof. The argument that Molders was "entitled to rely on the fact that the only injunction which had ever been issued by the Superior Court did not contain a bond [provision] . . ." is not worthy of comment.

### C

Petitioners contend on the following three grounds that they had no notice of the preliminary injunction: (1) Except for Monroy, they were

not personally served, (2) petitioners Hinojosa, Barba, and Zavala do not read English, and (3) none of the petitioners were expressly found to be agents of Molders.

Fuller, the plant superintendent, testified as to the manner of service of the preliminary injunction. He made 63 copies on June 1, 1976, and personally served Monroy when Monroy came into the office at 11:57 a.m. Since Monroy was shop steward for Molders, Fuller asked him to take about 30 copies out to the picket line, having earlier explained to him that they should be distributed to all the pickets. Monroy took them and placed them on a chair next to the pickup truck that served as headquarters for the picketers. Fuller then observed petitioners Hinojosa, Mietz and Zavala take copies off the chair during the day. He also saw "a lot of people" take copies and read them. Without indicating whether he saw them with a copy of the injunction, Fuller testified that he also observed petitioners Johnson (who owned the pickup camper) and Hinojosa on the picket line that afternoon, after the injunctions were passed out. The trial court expressly found that all the petitioners had knowledge of the terms of the preliminary injunction.

■ A party cannot be held in contempt if he had neither knowledge nor notice of an order for the violation of which the contempt is sought. (*Phillips* v. *Superior Court* (1943) 22 Cal.2d 256 [137 P.2d 838]; *Bryant* v. *Superior Court* (1939) 30 Cal.App.2d 509 [86 P.2d 837]; 5 Witkin, Cal. Procedure (2d ed. 1971) Enforcement of Judgment, § 165, p. 3526.) Therefore, the adjudication of contempt against Barba cannot be sustained.[5] ■ As for Mietz, Zavala, Johnson and Hinojosa, however, the facts testified to by Fuller are sufficient to support the findings of knowledge.

■ Petitioners' second argument, that Hinojosa, Barba and Zavala had no notice because they do not read English, is based upon "an offer of proof" made by their counsel at the hearing of June 29, 1976, to the effect that they had difficulty communicating orally in English. Counsel stated that a declaration to this effect would be filed; none was. None of these three petitioners testified, and there is no testimony whatever in the record to support the assertion. On the other hand, Fuller testified in response to the "offer of proof" that all three could read and speak English. He stated that Zavala and Hinojosa had worked at the plant for

---

[5] Fuller testified that he had seen Barba that morning, but "I can't swear I seen Barba that afternoon." No other evidence was presented bearing upon the issue of Barba's knowledge of the injunction.

some 15 years, during all of which time they had communicated in English. Barba was in Fuller's apprenticeship training class at Lodi High School and "he understood the questions and answered them when he read them when we gave tests . . . ." All three men were journeymen at the foundry, and Fuller stated that they were given instructions on paper and had to understand English in order to perform their assigned work duties.

Petitioners' third argument is that the preliminary injunction did not enjoin an individual unless he was an agent, representative or person "acting at the direction of" Molders, and that the court did not use this language in finding them in contempt. The argument is without merit, for the court's judgment expressly incorporates the counts charged in the Fuller declaration initiating the contempt proceedings; these each contain the specific allegation that the named individuals were "acting at the direction of authorized officers and agents of Local 164."

## D

Petitioners contend that there was no substantial evidence to support the judgment of contempt as to certain of them.

As with the same contention regarding the contempts against Molders, we have carefully reviewed the evidence relating to each count and have found it sufficient. The contemptuous actions ran the gamut from spitting into the faces of nonstriking employees to the attempted overturning of vehicles, smashing of windshields, and threats of violence and death. Except to repeat that such evidence well supports the contempt findings, there is again no need to describe it in detail.

## E

Petitioners' final argument is that the findings of contempt are invalid for failure to state the particular portions of the preliminary injunction that were violated. However, the court's reference to the counts alleged in the Fuller declaration is again sufficient.

Petitioner Zavala also makes the specific contention that his conduct alleged in count 8, "could not be a violation of both sub-section (c) and

sub-section (h) of the preliminary injunction" as alleged in the declaration, and therefore necessarily as found by the court. He does not elaborate upon this contention, nor does he explain his reasons for it.

The two subsections restrained Zavala from: "(c) Physically obstructing or physically interfering with the movement of any vehicle or person entering or attempting to enter, leaving or attempting to leave, approaching or attempting to approach, or departing or attempting to depart, from plaintiff's premises, including driveway; in this regard, no picket shall stop in or walk so slowly before any doorway or driveway so as to block the use of the doorway or driveway for more than five (5) seconds.

" . . . . . . . . . . . . . . . .

"(h) Impeding the passage of any vehicles or any persons on the streets or sidewalks in front of plaintiff's premises."

There is no reason why Zavala's conduct could not be a violation of both subsections.

With respect to the temporary restraining order, the judgment of contempt is affirmed. With respect to the preliminary injunction, the judgment of contempt as to Antonio Barba is vacated; in all other respects, these judgments also are affirmed. The stay order heretofore issued is dissolved.

Puglia, P. J., concurred.

**REYNOSO, J.**—I concur in part and dissent in part. With respect to the temporary restraining order, I dissent from that portion of the decision which affirms contempt against the union (Molders) as to counts 40 and 41 (treated as a single violation). In other respects I concur. With respect to the preliminary injunction, I concur in vacating the contempt order as to Antonio Barba, count 16. However, I dissent from that portion which affirms the contempt order against Tony Hinojosa, count 43; Charles

Johnson, count 29; and Donato Zavala, count 21. I further dissent from the finding of contempt against Molders in counts 21 and 43 (inasmuch as those counts are based on the acts of Zavala and Hinojosa). In other respects, I concur.

We deal with the typical pressures which arise in an area of economic warfare we call strikes. Ground rules have been established, particularly by the federal government, as to how those wars are to be waged. The record indicates that issues from this strike were taken into the federal courts, into the local police headquarters and into the state superior court. We specifically deal with (1) contempt proceedings against Molders arising out of a temporary restraining order and (2) contempt proceedings against Molders and six individuals arising out of a preliminary injunction.

I

TEMPORARY RESTRAINING ORDER

The majority view that the temporary restraining order did not violate Code of Civil Procedure section 527.3 is correct. A trial court has authority to limit the number of pickets at the entrances *after* evidence of interference with ingress and egress has been presented. Such a declaration was before the court.

The argument that the temporary restraining order expired before the hearing when counsel had stipulated to the continuance is difficult to accept. I agree that the limitation of dates is for the protection of defendant and is not jurisdictional. Accordingly, the time may be knowingly waived.

The dual objections that the declarations initiating the contempt proceedings gave inadequate notice to Molders and that there was not substantial evidence to support the contempt order are more troublesome.

In a heated strike situation, particularly when new employees are hired (called "scabs" or "strike breakers" by union people), feelings will run high. Words and tones of voice not acceptable at the local YWCA or YMCA are commonplace. Angry looks from striking employees are not unexpected. While pickets are exercising their statutory and First Amendment rights at a strike site, a new employee will naturally feel

some intimidation. It is with that in mind that the contempt orders are reviewed.

The issue of adequate notice, while close, must be resolved against the union. It is true that the employer's declarations took a scatter-gun approach hitting multiple incidents from persons standing still to overt acts of violence. Further, it is true that no facts were included to show agency or any other connection between the actors and the union. However, hearings were conducted in such a way that the union had an adequate opportunity to rebut after the employer presented its evidence. Thus, there was notice and an opportunity to defend.

The substantial evidence issue is more difficult.

I would vacate the finding of guilt as to counts 40 and 41 (treated as a single violation). Count 40 alleges interference with movement of a vehicle driven by an employee. The testimony of the employee, however, was as follows:

"A. I drove into the driveway and there were six pickets in the drive. They was just standing there for a while; I pulled up and stopped, and then they slowly walked to one side. One of the, you know, kind of split one way and one went one way and the others went the other way.

"Q. How long did that take?

"A. Oh, I'd say maybe ten seconds."

And count 41 alleges that the same employee was threatened by Cantu, a striker. The testimony is as follows:

"Q. What exactly did Horace Cantu say to you?

"A. He said, 'I'll be off watch in ten minutes. I'll meet you out back.' "

In the context of a heated strike, the actions appear to be that of pussy cats. The testimony is insufficient to show interference with the vehicle or threats of violence to the employee.

As to the remaining findings of contempt, I would affirm. While the evidence of agency is weak, I believe that the union, by taking no steps to discipline or otherwise show disapproval, has ratified the acts.

Counts 47 and 53 relate to the scattering of nails in the company parking lot on the mornings of May 24 and 25. An employee testified that nails were scattered on May 20 and again on May 24 and 25. He testified that he was the first employee to arrive on those days, that on each occasion union pickets were present when he arrived, and the nails had already been scattered, so that he did not actually see anyone scattering nails.

Petitioner argues that this circumstantial evidence is insufficient to support the contempt findings against the union, suggesting that inasmuch as there were guards at the plant all night who were not called to testify, one could just as easily conclude that the company itself scattered the nails. It is true that there was no direct evidence as to who scattered the nails. Nor was there evidence that whoever scattered the nails did so on behest of the union. However, the combination of motive and opportunity are sufficient to support the finding of the court that the union was responsible. The court's determination was buttressed by the pattern of harassment by the union members during the strike as well as the failure on the part of the union to demonstrate any disapproval.

The last finding of contempt, count 59, concerned a threat by Donato Zavala against employee Gary Vierra on the morning of May 27. Vierra testified to a continuing stream of intimidating conduct beginning the day he was hired on May 19. On that date as he walked to the company office to go to work, four or five pickets, including Zavala yelled unfriendly invectives which would make even a sailor wince. Vierra was advised that he was "not going to make it home tonight."

The following night Vierra left with one of the plant supervisors, and this time three carloads of pickets followed them. They drove around for about 20 to 25 minutes until they lost the pickets, and Vierra went home. Vierra called the plant the next morning, Friday, and reported that he was too scared to come to work.

When Vierra went to work the following week, the verbal threats (you are "really going to get it now") and invectives continued.

The intensity of attention given Vierra, no doubt because he was viewed as a "scab" and "strike breaker," clearly went beyond the acceptable levels of roughness even in a strike situation. Vierra was threatened with violence. The union at no time showed disapproval of

this extensive and long-lasting campaign against Vierra. Accordingly, it ratified those acts.

## II

### THE PRELIMINARY INJUNCTION

Six individuals were found in contempt. The judgment of contempt should be vacated as to the four individuals against whom there is no proof of actual knowledge. I concur that the contempt order, count 16, as to Antonio Barba be vacated. However, the contempt order should also be vacated as to Tony Hinojosa, count 43; Donato Zavala, count 21; and Charles Johnson, count 29. The record shows that they were not served; neither was there any showing of knowledge on their part. The testimony was that a pile of about 30 copies of the order was placed on a chair next to a pickup that served as headquarters for the picketers. I consider this "service," or notice, inadequate. Criminal contempt proceedings are of a very serious nature. Its basis in terms of notice must be more solid than shown in this record.

Accordingly, I concur and dissent as set forth above.

A petition for a rehearing was denied June 29, 1977. Reynoso, J., was of the opinion that the petition should be granted. Petitioner's application for a hearing by the Supreme Court was denied July 29, 1977. Bird, C. J., and Mosk, J., were of the opinion that the application should be granted.