[Civ. No. 63422. Second Dist., Div. One. May 21, 1982.]

INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULATORS AND ASBESTOS WORKERS, LOCAL NO. 5, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
SOUTHERN CALIFORNIA EDISON COMPANY, Real Party in Interest.

---

COUNSEL

Geffner & Saltzman and Howard Z. Rosen for Petitioner.

No appearance for Respondent.

John R. Bury, Charles R. Kocher, John W. Evans and Mark Emil Mikula for Real Party in Interest.

## OPINION

### SPENCER, P. J.—

#### INTRODUCTION

Petitioner [International Association of Heat and Frost Insulators and Asbestos Workers, Local No. 5] seeks, by writ of certiorari, review of an order finding petitioner in contempt for violation of a temporary restraining order and imposing a fine of $2,000.

#### BACKGROUND

The parties have stipulated to the facts. On April 10, 1981, real party in interest Southern California Edison Company (Edison) filed a complaint for injunctive relief. The complaint alleged that petitioner was engaged in a labor dispute with Miller Reel Company, a subcontractor performing insulation work for Edison; that a separate gate at Edison's El Segundo generating station, gate No. 1, had been designated for the exclusive use of Miller Reel employees but petitioner's pickets appeared at gate No. 2, utilized by Edison's employees; and that Edison's employees had refused to report for work, fearing for their physical safety and that of their vehicles, thereby jeopardizing the safe operation of the El Segundo generating station.

On the basis of uncontested affidavits and declarations offered in support of the allegations, Judge Weil found that there was no labor dispute between petitioner and Edison and that a continuation of petitioner's activity could impair Edison's ability to supply power to the southern California area. Thereafter, Judge Weil issued a temporary restraining order enjoining petitioner from picketing at gate No. 2 of the El Segundo generating station.

On the same date, Edison filed an unfair labor practice charge with the National Labor Relations Board alleging that petitioner's activities vis-à-vis Edison violated section 8(b)(4)(i)(ii)(B) of the National Labor Relations Act. (29 U.S.C. § 158 (b)(4)(i)(ii)(B).)

On April 13, 1981, the trial court issued an order to show cause re contempt, setting a hearing date of May 6, 1981. Petitioner later admitted four violations of the temporary restraining order.

On April 14, Judge Weil denied petitioner's ex parte application to vacate the temporary restraining order and denied Edison's request to order the arrest of persons picketing the neutral gate.

On April 15, petitioner moved for removal of the civil action to the United States District Court pursuant to 28 United States Code section 1441(b). Notice of removal was filed in superior court.

On the same date, the regional director of the National Labor Relations Board sought an injunction in the federal court, alleging that the regional director had reasonable cause to believe that the unfair labor practices charge leveled by Edison was true and that the union should be enjoined from engaging in a secondary boycott in its dispute with Miller Reel Company pending determination of the matter before the board. Thereafter, on April 17, the federal court issued a temporary restraining order ex parte. This was followed, on April 22, by a temporary injunction limiting picketing at the El Segundo generating station to gate No. 1, the gate utilized by Miller Reel Company employees.

On May 6, the superior court continued the order to show cause hearing to June 30.

On May 12, petitioner moved the federal court to restrain further proceedings in the state court and to dismiss Edison's complaint for injunctive relief as mooted by action on the National Labor Relations Board's petition. Edison responded by filing an amended complaint for damages.

On May 22, petitioner moved in superior court for a stay of proceedings.

On June 10, Judge Weil denied petitioner's motion to stay proceedings. On June 26, the federal court denied petitioner's motion to restrain further state court proceedings and declined to dismiss Edison's complaint as moot.

On August 4, a hearing was held before Judge Weil on the order to show cause re contempt. Judge Weil conceded that there was no evidence of violence or overt threats, but concluded that the temporary restraining order was within his jurisdiction and the contempt proceeding was not barred by removal of the underlying action. Thereafter, he

found petitioner in contempt for violation of the temporary restraining order on four occasions and levied a fine of $2,000.

## CONTENTS

### I

■ Petitioner contends that the superior court lacked subject matter jurisdiction to issue the temporary restraining order in that federal labor law preempts state regulation of petitioner's picketing.

### II

Petitioner further avers that the superior court acted in excess of jurisdiction in that Code of Civil Procedure section 527.3 prohibits the enjoining of peaceful picketing.

### III

Finally, petitioner asserts that removal of the underlying action to federal court barred the contempt proceeding.

For the reasons set forth below, we agree that federal labor law preempts state regulation of petitioner's picketing in the circumstances of the instant case. Accordingly, we do not reach petitioner's remaining contentions.

## DISCUSSION

Congress has confided exclusively to the National Labor Relations Board the regulation of activity arguably protected or prohibited by the National Labor Relations Act.[1] (*Sears, Roebuck & Co.* v. *Carpenters* (1978) 436 U.S. 180, 187-188 [56 L.Ed.2d 209, 219-220, 98 S.Ct. 1745]; *San Diego Unions* v. *Garmon* (1959) 359 U.S. 236, 245 [3 L.Ed.2d 775, 783, 79 S.Ct. 773].) There is, however, reserved to the states the power to regulate where the conduct in question touches "interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." (*Id.,* at pp. 243-244 [3 L.Ed.2d at p. 782]. See *United Workers* v. *Laburnum*

---

[1] There is no dispute as to the arguably prohibited nature of petitioner's conduct under the National Labor Relations Act.

*Corp.* (1954) 347 U.S. 656 [98 L.Ed. 1025, 74 S.Ct. 833] [overt threats of violence]; *Youngdahl* v. *Rainfair, Inc.* (1957) 355 U.S. 131 [2 L.Ed.2d 151, 78 S.Ct. 206] [violence and intimidation]; *Linn* v. *Plant Guard Workers* (1966) 383 U.S. 53 [15 L.Ed.2d 582, 86 S.Ct. 657] [libel]; *Farmer* v. *Carpenters* (1976) 430 U.S. 290 [51 L.Ed.2d 338, 97 S.Ct. 1056] [intentional infliction of emotional distress]; *Machinists* v. *Wisconsin Emp. Rel. Comm'n* (1977) 427 U.S. 132 [49 L.Ed.2d 396, 96 S.Ct. 2548] [blocked ingress and egress to facility and public streets]; and *Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. 180 [trespass].)

*Bus Employees* v. *Wisconsin Board* (1951) 340 U.S. 383 [95 L.Ed. 364, 71 S.Ct. 359, 22 A.L.R.2d 874] expressly held that a state's interest in the uninterrupted operation of essential public utilities was insufficient to justify state regulation of activity protected by the National Labor Relations Act. (*Id.,* at pp. 396-398 [95 L.Ed. at pp. 376-377].) However, the issue of whether the emergency resulting from a substantial threat of imminent disruption in the operation of a public utility comes within "such traditionally local matters as public safety and order and the use of streets and highways" (*Allen-Bradley Local* v. *Board* (1941) 315 U.S. 740, 749 [86 L.Ed. 1154, 1164, 62 S.Ct. 820]; see also *Machinists* v. *Wisconsin Emp. Rel. Comm'n, supra,* 427 U.S. 132) was left open.

*Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. 180 reiterated the criteria which warrant a departure from general preemption doctrine in arguably prohibited conduct instances of local interest: "First, there existed a significant state interest in protecting the [citizenry] from the challenged conduct. Second, although the challenged conduct occurred in the course of a labor dispute and an unfair labor practice charge could have been filed, the exercise of state jurisdiction ... entailed little risk of interference with the regulatory jurisdiction of the Labor Board." (*Id.,* at p. 196 [56 L.Ed.2d at p. 225]; see also *Farmer* v. *Carpenters, supra,* 430 U.S. 290, 302 [51 L.Ed.2d 338, 351-352].) Accordingly, the critical inquiry is whether the controversy presented to the state court is essentially the same as that which could be presented to the board. (*Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. 180, 197 [56 L.Ed.2d 209, 225].)

In the instant case, the evidence establishes and Judge Weil found that "if this conduct continues, the integrity and ability of this power

station to furnish power to the citizens of Southern California may be impaired .... " Whatever result might be reached in the face of a substantial threat of imminent disruption, we conclude that the mere *possibility* that Edison's ability to deliver power *may* be impaired is not sufficient to invoke a deeply rooted and significant state interest in protecting the citizenry from petitioner's picketing activity. Moreover, the controversy in superior court is identical to that placed before the board; that is, petitioner's right to picket gate No. 2. Despite the recitation in declarations submitted by Edison of hearsay employees' statements expressing fears for their safety and that of their personal property, no evidence was presented that the pickets *in fact* behaved in a violent, threatening or intimidating manner. Indeed, Edison did not truly rely on a "violence" exception; the core of Edison's complaint was that it was wholly an "innocent bystander" unfairly subjected to a secondary boycott. In response, petitioner submitted to the superior court documents expressing the substance of its federal defense to the charge of unlawful secondary boycott; to wit, that gate No. 1 was so isolated as to foreclose any adequate opportunity of informing the public of petitioner's grievance by picketing at that location.

The exercise of state jurisdiction in affording Edison a remedy essentially identical to that available from the National Labor Relations Board, based on precisely the same conduct, entails substantial risk of interference with the regulatory jurisdiction of the board. (See *Weber* v. *Anheuser-Busch, Inc.* (1954) 348 U.S. 468, 479 [99 L.Ed. 546, 556-557, 74 S.Ct. 480]; *Garner* v. *Teamsters Union* (1953) 346 U.S. 485, 498-499 [98 L.Ed. 228, 243-244, 74 S.Ct. 161].) Accordingly, general principles of preemption necessarily deprived the state court of jurisdiction over petitioner's conduct. Inasmuch as the superior court lacked jurisdiction to issue a temporary restraining order, the order cannot support a contempt proceeding. (*In re Berry* (1968) 68 Cal.2d 137, 148 [65 Cal.Rptr. 273, 436 P.2d 273].)

The order adjudging petitioner guilty of contempt and imposing a fine of $2,000 is vacated.

Dalsimer, J., concurred.

HANSON (Thaxton), J.—I respectfully dissent. I would affirm the order of the superior court adjudging petitioner International Association of Heat and Frost Insulators and Asbestos Workers, Local No. 5, (hereinafter Union) in contempt and imposing a $2,000 fine.

On April 10, 1981, real party, Southern California Edison Company, a corporation (hereinafter Edison) filed a complaint, with supporting affidavits, for injunctive relief in respondent superior court, a state court of general jurisdiction. Edison in the complaint alleged that the Union was engaged in a labor dispute with Miller Reel Company (Miller Reel), a subcontractor performing insulation work at Edison's El Segundo generating station; that a separate gate, *gate No. 1*, at Edison's generating station was specifically designated for the exclusive use of ingress and egress by subcontractor Miller Reel's employees; that the Union did *not* picket *gate No. 1* but picketed *gate No. 2* used by Edison's employees; that a large number of Edison employees fearing for their physical safety and that of their vehicles refused to report for work; and that the picketing caused irreparable harm to Edison, warranting the court to issue a temporary restraining order.

The uncontradicted affidavit by James L. Zumwalt, supervisor of plant engineering and acting plant superintendent, dated April 9, 1981, supporting Edison's complaint for injunctive relief in pertinent part states: "Edison has a service territory of approximately 50,000 square miles and serves over 3 million customers. The El Segundo Station represents a basic generating resource of the Company and is incidental to the health, welfare and safety of the entire Southern California area. The Station is manned by three 8-hour shifts per day, each shift consisting of 7 operators with one supervisor. The Station is maintained by a force of approximately 30 maintenance people who work predominantly during the day shift. [¶] Currently, Miller Reel Company is performing boiler insulation repair work on a contract basis as an independent contractor. [¶] Miller Reel Company employees have at all times been entering and exiting the El Segundo Generating Station site through the 45th Street gate, which is designated as Gate No. 1. The 45th Street gate used only by the Miller Reel Company employees has been posted with a large sign with the following legend:

STOP AND READ

GATE '1'

This gate reserved for personnel, visitors, suppliers of contractors listed below. All others use Gate #2.

---

MILLER REEL COMPANY

The main gate which is designated as Gate No. 2 has also been posted with a large sign which has the following legend:

STOP AND READ

GATE #2

This gate may not be used by personnel, visitors and suppliers of the contractors listed below:

MILLER REEL COMPANY

All other must use this gate.
When I arrived this morning at the main gate at 6:45 a.m., I observed approximately 6 picketers carrying picket signs with the following legend:

Miller Reel
UNFAIR
to
Asbestos Wkrs. Local #5
Not Paying Prevailing Wages
and Fringe Benefits
Sanctioned by
Los Angeles County
Building & Construction
Trades Council, AFL-CIO
and
TEAMSTERS
Joint Council 42

"I then requested Mr. Vern Nelson, Clerical Supervisor, to send the following telegram to Mr. Roger Hamilton: 'This is to advise you that separate entrances have been established at the Southern California Edison Company facility at 301 Vista Del Mar, El Segundo. The entrance labeled Gate No. 1 located at the west end of 45th Street is for employees and suppliers of Miller Reel Company and the entrance labeled Gate No. 2 located at 301 Vista Del Mar is for employees and

suppliers of neutral employers. [¶] If you wish to picket Miller Reel Company while they are working on this project, do so only at Gate No. 1. [¶] Picketing at any other location at this job site will be considered secondary and all appropriate legal action will be taken.'

"Western Union subsequently verbally confirmed its delivery of the telegram to Mr. Roger Hamilton. The picketers remained at the gate until approximately 4:10 p.m., at which time they departed.

"As a result of the above-described pickets being at the main gate of the El Segundo Generating Station, 21 employees of the normal day shift refused to cross. In addition, 5 employees of the swing shift refused to cross. As a direct result of this unlawful picketing by Local 5, it became necessary for Edison to hold over its graveyard shift employees for an additional 8 hours in order to continue the safe and reliable operation of the plant. In addition, it has become necessary to schedule substantial overtime to make up for the work not completed by the maintenance people who also failed to report for work. In short, as a result of the above-described illegal activities by Local 5 of the Asbestos Workers Union, Southern California Edison Company has suffered substantially increased operating and maintenance costs, loss of productivity, and schedule delays. Should this activity be allowed to continue, it is anticipated that the operating reliability of the plant will be substantially reduced. The net result of allowing this illegal activity to continue unabated will be a serious detriment to the general public, to Southern California Edison Company and specifically to its ratepayers and customers."

A *second* affidavit by Mr. Zumwalt dated April 10, 1981, in part states: "Miller Reel Company's employees are on the job from 7:00 A.M. until 3:30 P.M. each day. Edison employee's shifts are as follows: 7:30 A.M.-3:30 P.M. 3:30 P.M.-11:30 P.M. 11:30 P.M.-7:30 A.M. [¶] This morning, April 10, 1981. [*sic*] I observed 20 pickets at the neutral gate (main gate) and 6 to 8 pickets at the gate set aside for the Miller Reel employees. [¶] Southern California Edison has a subcontract with Miller Reel Co. to perform insulation work on unit No. 2 boiler. This particular boiler would be out of operation for another week because of the work being performed on it. At the same time our employees have been performing normal cleaning work on the boiler. Miller Reel Co. has between 5 and 6 asbestos workers on the job at this time. The total value of the subcontract is $16,000. [page 3] [¶] Miller Reel Co. began work at the plant on Monday, April 6 and worked with-

out incident on April 6, 7 and 8. On Monday, April 6, 1981 prior to 7:00 a.m., Edison had posted signs at the main gate and at the gate set aside for Miller Reel employees before Miller Reel employees appeared for work. These are the same signs that presently are posted. In addition, Around [sic] April 2 or 3, 1981, I had given instructions to the security officer's supervisor that the security officer at the main gate (Gate #2) should not permit Miller Reel's employees to use the main gate at any time. [¶] Both on April 9 and 10 various first line supervisors have informed me that employees have telephoned them, stating that they were afraid to come in to work because of fear of damage to their vehicles and fears for their personal safety. [¶] The pickets are walking across the entrance to the main gate (Gate #2). Most of the pickets are carrying signs. [¶] On April 9, the first day of the picketing 21 out of 30 Edison day shift employees refused to cross the picket line. And only 2 out of 7 swing shift and graveyard shift employees reported to work. Today, April 20, 1981, 23 out of 30 day shift employees refused to cross the picket line. [¶] As of April 10, 1981 only 2 of the 4 boilers at the plant are operating. We were forced to shut down a second boiler on April 9 because of a mechanical breakdown. Because of the picketing, we have been forced to utilize supervisors to perform the repair work on this boiler in conjunction with the few employees presently working. [¶] There is presently a potential for a 'brown-out' or load curtailment because we have been forced to utilize supervisors to maintain the equipment and this decreases the reliability of the equipment. There is the potential for a mechanical breakdown in one of the 2 remaining operating boilers because they are being controlled and operated by supervisors. It is essential that we get 1 of the 2 other boilers back into operation as soon as possible. Work on the boiler which called for subcontracted work has been delayed because of the picketing and will not be completed, as originally planned, by the [page 6] end of next week unless drastic action is taken. [¶] Southern California Edison plant employees are represented by Utility Workers of America. None of its employees are represented by the Asbestos Workers Union. [¶] To my knowledge, the employees of Miller Reel Co., are not represented by the Asbestos Workers Local 5."

In a *third* affidavit by Mr. Zumwalt dated April 15, 1981, he states that he sent the following telegram to Mr. Roger A. Hamilton, business manager of the Union: "This is to inform you that contempt proceedings have been instituted against Local 5, Mr. Ken DeBoom, Business Representative of Local 5, and you personally, by Southern California Edison Company. Southern California Edison Company further intends

to initiate civil action against Local 5, Mr. DeBoom, and you for damages Edison has sustained and is continuing to sustain as the result of your willful violation of the temporary restraining order and preliminary injunction issued by Judge Weil of the California Superior Court with which you were served on April 10, 1981 at 9:40 p.m. [¶] We wish to confirm, as you have no doubt observed during the course of your picketing, that the working hours of the Miller Reel Company's employees at the El Segundo Generating Station are from 7:00 a.m. to 3:30 p.m., Monday through Friday."

In addition to the affidavits by Mr. Zumwalt in support of Edison's complaint, were uncontradicted affidavits of George E. Etzel, Vern Nelson, Clinton L. Walsh, Joseph Russell, Janet Lantner, Joy B. Cox, and Phillip de Prato, all Edison supervisory personnel at the El Segundo generating station. In summary, these affiants had either talked personally or by telephone to 15 Edison employees who refused to report to work by reason of the Union pickets because they feared for their personal safety and their families and/or their vehicles.[1]

---

[1]Mr. Etzel, division maintenance foreman, confirmed in his affidavit that the signs described in Mr. Zumwalt's affidavit were posted at gate No. 1 and gate No. 2 were size 3 feet x 4 feet, and were in place on April 6, 1981.

Mr. Nelson, division clerical supervisor, stated that on April 9, 1981, he spoke to Edison employees Sue Gable and Paul Herrera who were standing outside the Union's picket line and that "They told [him] they feared for their personal safety and the safety of their vehicles if they crossed the picket line to report to work" and that neither of these individuals reported to work.

Mr. Walsh, maintenance foreman, stated on April 9, 1981, at about 8 p.m. he talked by telephone to Edison employees Perdie Washington, Curtis Myers, Bliss Lamb, Cliff Brewer and Gary Halman and each told him in substance that "there were pickets on the gate and said he was fearful for his life because they might cause him bodily harm" and that none of them reported to work on April 9, 1981.

Mr. Russell stated in his affidavit that on April 9, 1981, at about 8:30 a.m. he talked by telephone to Edison employees Don Eldard, Bliss Lamb and Ernie Hine and that they refused to report to work because they feared that crossing the picket line would jeopardize their safety. Bliss Lamb stated that "I am not going to get involved in a labor dispute." None of these employees reported for work on April 9, 1981.

Ms. Lantner, engineer II at Edison talked to Edison employee Chuck Lindner by telephone on April 9, 1981, at about 9 a.m. and he stated again that he would not cross the picket line because he feared "action would be taken against him."

Mr. Cox, supervisor of plant operations, at the generating station, spoke to a number of Edison employees on April 9, 1981, at about 7:15 a.m. at gate No. 2 "milling around me discussing the picketing situation" and each of them "told [him] that they wanted to come to work but would only do so if [he] could personally guarantee their personal safety and the safety of their personal property. They also expressed concern about their future safety and the safety of their families."

Mr. De Prato, watch engineer at the Edison generating station who supervises plant operations on the day, swing and graveyard shifts stated in his affidavit that on April 9, 1981, at about 4 p.m. preparing for the swing shift he had a telephone conversation

The record further shows that the Union did not represent any of the subcontractor Miller Reel's employees but complained that Miller Reel was paying its nonunion employees a basic wage rate below that established as standard by the Union.[2]

On April 10, 1981, the superior court (Judge Robert I. Weil presiding) based on the foregoing uncontested affidavits and declarations filed by Edison issued a temporary restraining order enjoining the Union from picketing at gate No. 2, the gate used by Edison employees. The court found that there was no labor dispute between Edison and the Union; that the continuation of the picketing could impair Edison's ability to supply electrical power to the southern California area; and that the temporary restraining order should remain in effect so long as the signs posted on gate Nos. 1 and 2, as described in Mr. Zumwalt's affidavit, were prominently posted or until the hearing on the order to show cause.

On the same date that Edison sought relief in the state court it also filed an unfair labor practice charge with the National Labor Relations Board (NLRB). The NLRB on April 22, 1981, sought an injunction in the federal court finding that there was a reasonable cause to believe

with Edison employees Greg Kelly, control operator, Jim Turner, control operator, Mike Fellinger, apprentice control operator, Jim Meadows, apprentice control operator, and Gerald Robins, plant equipment operator, who told him that "[they] said if the pickets left, [they] would report to work, but [they] feared for [their] safety if [they] crossed the picket lines."

[2]The record contains a copy of a letter sent to Miller Reel signed by Roger A. Hamilton, business manager, dated April 8, 1981, by certified mail, which stated: "Dear Sir: It has come to our attention that you are currently engaged in maintenance and repair work in the geographical jurisdiction of Asbestos Workers Local Union #5, employing employees performing work traditionally performed by the Asbestos Workers. [¶] It is our understanding that you are not paying the wages established by Asbestos Workers Local Union #5, Los Angeles for such work in its area. [¶] Those wages are $21.63 per hour. This per hour wage rate is the sum of the employee's basic wage rate and the money amount only of the hourly contribution rate for pension, health and welfare and vacation pay. [¶] We do not seek to represent any of your employees for collective bargaining purposes and disclaim any such interest or object. Our sole purpose is to prevent the erosion of wage standards in our area. [¶] We intend to engage in lawful primary picketing of you to advertise to the public that you do not pay area standard wages. Such picketing will be conducted only against you as it is not our intention to enmesh neutrals in our dispute with you. [¶] If you are paying area standard wages, please contact Ken DeBoom local Union Business Representative at (213) 384-4171 immediately to arrange for the furnishing of reasonable proof of your payment of area standard wages. Upon such demonstration, no area standard picketing will be conducted. [¶] If at any time after picketing begins, you start paying area standard wages, please so notify Ken DeBoom and arrange for the furnishing of reasonable proof of such payment, after which area standards picketing will cease immediately."

that Edison's charges were true and requesting that the Union should be enjoined from engaging in a *secondary boycott* in its dispute with the subcontractor, Miller Reel. A United States district judge signed the NLRB's findings of fact and conclusions of law the same date, April 22, 1981.

The federal court not only issued a temporary injunction limiting the Union's picketing to gate No. 1, the gate designated for use by Miller Reel's employees, but later denied the Union's motion to restrain Edison's state court proceedings which by then involved an order to show cause re contempt based on the Union's disregard of the superior court's temporary restraining order enjoining the Union from picketing at gate No. 2.

At a subsequent hearing in the superior court on the show cause re contempt order, Judge Weil found that there was no evidence of violence or overt threats but the temporary restraining order was within the court's jurisdiction and found that on four occasions the Union violated the court's order[3] and levied a $2,000 fine. It is from this order that the Union seeks relief in this court.

DISCUSSION

I

In my opinion the superior court did *not* lack jurisdiction to issue the temporary restraining order, as contended by the Union, and the record supports the finding of contempt by the Union and the $2,000 fine. I conclude that the urgency of the situation did not preclude Edison from simultaneously proceeding both in the state court and the NLRB on the same date.

The landmark case of *San Diego Unions* v. *Garmon* (1959) 359 U.S. 236 [3 L.Ed.2d 775, 79 S.Ct. 773] sets forth the current preemption

---

[3]The affidavit of John W. Evans, an attorney for Edison, in pertinent part states: "The work schedule of the Miller Reel Company at the El Segundo plant is 8:00 a.m. to 4:30 p.m. Monday through Friday. [¶] Beginning at approximately 6:00 a.m. on Saturday, April 11, 1981 and continuing to the present time, there has been virtually around-the-clock picketing of Gate No. 2 (the main gate) of the El Segundo Generating Station of the Southern California Edison Company by members of Local No. 5 of the International Association of Heat and Frost Insulators & Asbestos Workers. [¶] Said picketing has continued at times during which no employee of the Miller Reel Company was on the El Segundo Plant Site."

doctrine. The *Garmon* court said at page 245 [3 L.Ed.2d at page 783]: "When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."

However, the *Garmon* court tempered the above holding by stating at pages 243-244 [3 L.Ed.2d at page 782], that it *"has required [them] not to find withdrawal from the States of power to regulate where ... the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act."* (Fn. omitted.) (Italics added.)

Justice Harlan, concurred in by Justices Clark, Whitaker and Stewart, filed a separate opinion in *Garmon* approving the result of the majority opinion only on the narrow ground that the Union's activities for which the state awarded damages was fairly considered protected under the Taft-Hartley Act, and that therefore state action was precluded until the NLRB made a contrary determination respecting such activities.

The separate opinion of Justice Harlan did not concur in the majority opinion in *Garmon* since it perceived it as a landmark in future "preemption" cases in the labor field. Justice Harlan stated: "Henceforth the States must withhold access to their courts until the National Labor Relations Board has determined that such unprotected conduct is not an unfair labor practice, a course which, because of unavoidable Board delays, may render state redress ineffective. And in instances in which the Board declines to exercise its jurisdiction, the States are entirely deprived of power to afford any relief. Moreover, since the reparation powers of the Board, as we observed in *Russell*, are narrowly circumscribed, those injured by nonviolent conduct will often go remediless even when the Board does accept jurisdiction." (*Id.*, at p. 253 [3 L.Ed.2d at p. 788].) (Italics added.)

The United States Supreme Court decisions since the 1959 *Garmon* decision have apparently acknowledged Justice Harlan's concern that the states should retain the power to act in the face of the "preemption" rule. In short, the states have retained control over local interests and concerns which involve the protection of the local public health and safety under *Garmon* and its progeny.

In *Linn* v. *Plant Guard Workers* (1966) 383 U.S. 53 [15 L.Ed.2d 582, 86 S.Ct. 657] a union circulated an allegedly libelous leaflet, prompting a supervisory employee to sue for libel in state court. In reversing the lower court's decision that the conduct was arguably an unfair labor practice and that *Garmon* compelled dismissal, the Supreme Court ruled that a state's concern with redressing libel was "'so deeply rooted in local feeling and responsibility' that it fits within the exception specifically carved out by *Garmon.*" (*Id.*, at p. 62 [15 L.Ed.2d at p. 589].)

In *Farmer* v. *Carpenters* (1977) 430 U.S. 290 [51 L.Ed.2d 338, 97 S.Ct. 1056], the court ruled that the state cause of action for intentional infliction of emotional distress was not preempted.

In *Machinists* v. *Wisconsin Emp. Rel. Comm'n* (1976) 427 U.S. 132, 136-137 footnote 2 [49 L.Ed.2d 396, 401, 96 S.Ct. 2548], it was held that a state may enjoin picketing in certain circumstances to protect the public access to the streets and highways and freedom of movement and exercise "'its historic powers over such traditionally local matters as public safety and order and the use of streets and highways, . . .'" (See also *Kaplan's Fruit & Produce Co.* v. *Superior Court* (1979) 26 Cal.3d 60 [162 Cal.Rptr. 745, 603 P.2d 1341] (picketing which interferes with access may be reasonably restricted); and *International Molders etc. Union* v. *Superior Court* (1977) 70 Cal.App.3d 395 [138 Cal.Rptr. 794] (a temporary restraining order may place reasonable restrictions on those picketing activities which could result in interference with access and freedom of movement).)

I construe the underlying rationale of the above cases, including *Garmon* to be that if the scheme of the federal labor law is not significantly interfered with the state's historical responsibility to protect the health, safety and welfare of the local citizens should not be impaired by the preemption rule.

In the case at bench the critical local importance of a continuous supply of electricity to the southern California area was clearly the reason Judge Weil issued the temporary restraining order. He said "[T]here is evidence before the court that if this conduct continues, the integrity and ability of this power station to furnish power to the citizens of Southern California may be impaired prior to the time when the National Labor Relations proceeding can reach its normal course. . . . I believe under the circumstances of this case where the integrity of the

power supply to Southern California residents is concerned and where the dispute here involved is not a dispute between Southern California Edison Company, the petitioner, and the Union involved that I do not believe federal law applies...."

In the instant case the urgency of maintaining an uninterrupted supply of electricity to the residents of the densely populated area of approximately 50,000 square miles serving over 3 million customers is certainly a more critical local concern than the prevention of trespass, malicious libel, threats, violence or the blocking of access— all of which have been held to be areas of particular local concern and are within the subject matter jurisdiction of a state court. A cut off of electricity in the southern California area could have a devastating effect on the public health, safety and welfare, such as total community shut down, including governmental functions; massive food spoilage; households left without cooking or heating facilities; looting, violence and fires; and traffic stoppage, accidents by reason of signal lights not working, etc.

The cases have permitted state courts to exercise authority over picketing activities in a limited area if such activities could result in threats of violence, jeopardize the public safety, or prevent the public from the free use of the streets and highways. In issuing the temporary restraining order in the instant case, the superior court properly acted to prevent the potential disasters described above.

The superior court order was based, in part, on the uncontroverted affidavits and declarations which emphasized that the picketing by the Union would jeopardize the local public health and safety which, in the *Garmon* language, are "interests so deeply rooted in local feelings and responsibility." I would hold the injunction was within the jurisdiction of the superior court.

In determining whether a state may assert jurisdiction over certain activities, consideration is given to the nature of the state interest being asserted and its effect upon the administration of national labor policies. (See *Farmer* v. *Carpenters, supra*, 430 U.S. 290, 300-301 [51 L.Ed.2d 338, 350-351].) Here, the nature of the circumstances giving rise to the superior court's order and the limited relief sought from that court reveals no significant interference with the federal regulatory scheme.

Moreover, the superior court proceedings did not conflict with the proceedings before the NLRB. Significant here is the stipulated fact that the union had no labor dispute with Edison. Edison had no contract with the Union, never negotiated with it, and never directly employed its members. Edison could be characterized as an "innocent bystander." The cases relied on by the Union pertain to the situation where states are preempted from asserting jurisdiction over activities arguably prohibited or protected by the act and where there was a *direct* relation or dispute between the employer seeking relief and the Union.

Furthermore, the likelihood of the superior court's order conflicting with federal policy is a bare minimum since there were no labor relations between Edison and the Union. The potential for conflict of the superior court's order with federal policy was also minimized by the nature of the relief sought by Edison and granted by the trial court. Edison did not seek to enjoin the Union's picketing altogether. The court gave due consideration to the Union's right to picket to inform the public as well as the subcontractors with whom the Union had a dispute. The order was extremely narrow and ensured the Union's labor and free speech interests would be protected. The order, by implication, permitted picketing in any number, manner, time or place it chose, with the *limited exception* of gate No. 2 used by Edison employees. The Union was not prohibited from communicating its message effectively to the general public by merely moving the picketing to gate No. 1.

In short, Judge Weil's narrowly drawn order merely restricted that portion of the picketing area which the court found would threaten the power supply to the community and thereby the public safety.

In *Youngdahl* v. *Rainfair, Inc.* (1957) 355 U.S. 131 [2 L.Ed.2d 151, 78 S.Ct. 206], the court overturned that portion of state injunction banning all picketing, reasoning that its breadth raised a preemption problem, while affirming that portion limited to the prevention of intimidation and violence.

In *International Molders etc. Union* v. *Superior Court, supra,* 70 Cal.App.3d 395, the court permitted reasonable restrictions on the placement of pickets which would not hinder the union in communicating its grievances effectively but could prevent public safety hazards.

Finally, Edison did not seek any relief from the superior court which would conflict with the actions taken by the NLRB. Edison requested the temporary restraining order because it was unclear whether an unfair labor practice charge had been committed by the Union concerning Edison so as to prompt the NLRB to seek relief in federal court. Edison owed a duty to the public to protect its right to a continuous supply of electric power. Immediate relief was essential. The NLRB, on the other hand, did not obtain any sort of injunctive relief until *eight days* later. The relief sought by the NLRB was to protect interests other than those considered by the state court and the injunction issued by the federal court did not conflict with the state order. Following the issuance of this order, which provided a similar protection for its customers, Edison did not further pursue its state injunctive action.

## II

I summarily dispose of the Union's contention that Code of Civil Procedure section 527.3 (hereinafter section 527.3) prohibits the enjoining of peaceful picketing.

Section 527.3, California's anti-injunction statute, is predicated in its entirety on the existence of a *labor dispute*, which is genuine or real, and, if none exists, the statute has no application. A labor dispute is defined in section 527.3, subdivision (b)(4)(iii) as follows: "The term 'labor dispute' includes any controversy concerning the terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment regardless of whether or not the disputants stand in the proximate relation of employer and employee."

Here, it was admitted by the Union and acknowledged by Judge Weil that Edison and the Union were not "disputants" as that term is used in section 527.3, subdivision (b)(4)(iii). Section 527.3 does not apply to the instant situation.

Even in cases where a labor dispute may be involved, the authority of state courts to issue injunctions against that aspect of picketing marked by threats to the public order has long been upheld in spite of the state's anti-injunction statute. Furthermore, even though the acts com-

plained of may not be unlawful under ordinary circumstances, when they are linked with a result inimical to the welfare and health of an entire community, they may be enjoined. In *International Molders etc. Union* v. *Superior Court, supra*, 70 Cal.App.3d 395 the court said: """"Needless to say, nothing in this opinion should be construed as prohibiting a court from enjoining violence, activity which contains threats of injury, violence or reprisals, *activity which creates public safety hazards*, or activity which obstructs ingress and egress to buildings or stores.""" (*Id.*, at p. 403. Quoting from *United Farm Workers Organizing Committee* v. *Superior Court* (1971) 4 Cal.3d 556 [94 Cal.Rptr. 263, 483 P.2d 1215].) (Italics added.)

## III

Nor was it improper, as contended by the Union, for the hearing in re contempt to proceed even though the action was also proceeding before the NLRB and the federal court.

As set forth in the majority opinion on April 10, 1981, a temporary restraining order was issued. On April 13, 1981, an order to show cause why the Union should not be adjudged in contempt for violation of the order on April 11, 12 and 13, 1981, was issued by the same court and a hearing on the matter was set. Only *after* these orders were issued did the Union, on April 15, 1981, file its petition for removal. Accordingly, here we are only concerned with the authority of a state court to hear and enforce a violation of its order, issued prior to the filing of a petition for removal, through the time-honored mechanism of contempt.

I am aware of no federal or California doctrine or principle of jurisdiction which denies a state court's right or ability to enforce its orders in the face of a removal action.

In *Erwin Mills* v. *Textile Workers Union of America, CIO* (1952) 235 N.C. 107 [68 S.E.2d 813], a state court issued a temporary restraining order enjoining an unlawful strike of plaintiff's business. After violations of the order were complained of, the court issued an order to show cause why defendants should not be found in contempt. Only *after* these actions had transpired did defendants file their petition for removal to federal district court. The North Carolina Supreme Court held the state court had jurisdiction to proceed on the contempt hearing.

In enforcing the injunction issued at the request of the plaintiff by holding the Union in contempt, the *Erwin* court emphasized the right of the state court to preserve the dignity of its orders. Even the filing of a petition for removal does not "[P]revent the state court from continuing proceedings to maintain respect for its orders and to punish contemptuous violation thereof." (*Id.*, at p. 815.)

In *United States* v. *Dickinson* (5th Cir. 1972) 465 F.2d 496, the court said: "[T]he deliberate refusal to obey an order of the court without testing its validity through established processes requires further action by the judiciary, and therefore directly affects the judiciary's ability to discharge its duties and responsibilities. Therefore, 'while it is sparingly to be used, yet the power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration whose judgments and decrees would be only advisory.'" (*Id.*, at p. 510; citations omitted.)

Upon issuing a presumptively valid order at a time when the Union, by its counsel, was present, the superior court had a legitimate expectation that the persons subject to it would comply until it was modified or withdrawn, even if there were grounds for objecting to the issuance of such an order. (See *GTE Sylvania, Inc.* v. *Consumers Union* (1980) 445 U.S. 375 [63 L.Ed.2d 467, 100 S.Ct. 1194].)

When a California court issues an order directing a party to refrain from doing an act, contempt proceedings are an available sanction for violation of the order. The proceeding is commenced by the filing of an affidavit which constitutes the complaint, with the affidavits of defendant treated as an answer. The affidavits serve as the pleadings, framing the issues to be tried in a separate hearing. (*Freeman* v. *Superior Court* (1955) 44 Cal.2d 533, 536 [282 P.2d. 857].)

In *Morelli* v. *Superior Court* (1969) 1 Cal.3d 328 [82 Cal.Rptr. 375, 461 P.2d 655], the defendant disobeyed a subpoena duces tecum issued in connection with a civil action. After the court issued an order to show cause why the petitioner should not be held in contempt for failure to obey the subpoena, the underlying cause of action was dismissed. The California Supreme Court drew a distinction between the underlying cause of action and the contempt, concluding that the "[T]ermination of the action ... does not prevent the court from imposing punishment for a criminal contempt committed therein." (*Id.*, at

p. 332.) Where the object of the contempt proceeding is to vindicate the dignity of the court, the fact that the underlying action has been terminated does not divest the court of its authority to act.

Similarly, in *Dolley* v. *Ragon* (1924) 67 Cal.App. 731 [228 p. 664], the Court of Appeal recognized its ability to consider a contempt arising out of a cause of action which was no longer before the court. "[N]otwithstanding the fact that the judgment has become final in this court and the appeal is now beyond our jurisdiction, nevertheless this court has authority to receive and consider any charges of acts constituting contempt of court by an attorney in his conduct or action." (*Id.*, at p. 732.)

The rationale underlying the court's decision acknowledged the distinction between the contempt action and the main cause of action. Recognizing the independent nature of the contempt hearing, the court ruled it could proceed even though the basis for the action was no longer within the court's jurisdiction. (See 2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 17, p. 894) "Although prosecuted under the title of the main action or proceeding, contempt is nevertheless a *separate proceeding*"; and 5 Witkin, Cal. Procedure (2d ed. 1971) Enforcement of Judgment, § 163, p. 3524 "Even though the contempt proceeding is usually commenced by an affidavit filed in the main action, the contempt proceeding is separate and distinct.")

In the case at bench, by filing a petition for removal the Union merely secured the removal of the underlying cause of action. In view of the independent nature of a contempt proceeding, it is axiomatic that the removal of the civil complaint does not affect the contempt proceeding. The superior court was within its authority to proceed in the contempt hearing and hold the Union in contempt of court for the willful violation of its order.

## IV

Aside from the legalistics of this case, what we have here is a Union which knowingly pickets a gate specifically designed for use by the employees of a major public utility, which supplies electricity to a densely populated southern California urban area serving over three million consumers, with which the Union has absolutely no labor dispute. The Union's dispute was solely with a subcontractor (who employed five to six nonunion asbestos workers) of the electricity supplier who the Union

knew used a separate designated gate for ingress and egress to the generating station area. According to uncontested affidavits numerous employees of the electric generating utility refused to come to work for fear of the picket line at the gate used by them and thus a shut down of the generating station depriving electricity to about three million consumers became imminent. The continuous uninterrupted supply of electrical energy to our modern society is of vital importance. The adverse effect on the public would be enormous. The damage would not only have been done to Edison and its customers but innocent third parties injured by such a shut down, could potentially seek civil damages against the Union in the millions of dollars by reason of the Union's illegal violation of a valid court order and Union's secondary boycott.

The utility faced with such an emergency properly took all steps within the law—by seeking to enjoin the Union in the state court and simultaneously filing a complaint with the NLRB. The state court moved immediately with an injunction very limited in scope ordering the Union to cease picketing at the utility company's employees' gate but which did not restrict peaceful picketing at the gate used by the subcontractor with whom the Union had the labor dispute or at any other location.

Here, the Union deliberately refused to obey the order of the superior court on the ground that it did not have jurisdiction. Respect for the authority of any court order and the law in general requires the Union to comply with the injunction of the state court and contest the jurisdictional issue before a higher court of review within the state court system. The superior court had the right and duty to vindicate its authority and dignity and exercise its power to process the violation of its order.

## V

Finally, in the case at bench a writ of certiorari is a discretionary writ and petitioner has no right as a matter of course to its issuance. (*Wine* v. *Council of City of Los Angeles* (1960) 177 Cal.App.2d 157, 169 [2 Cal.Rptr. 94].) The writ will only lie if petitioner can demonstrate a lower court acted in the absence or excess of jurisdiction. (Code Civ. Proc., § 1068.) I conclude that the Union has not demonstrated that the superior court exceeded its jurisdiction by issuing the temporary restraining order. Nor has the court below acted improperly in any other respect.

Accordingly, I would deny the Union's request for the issuance of a writ of certiorari, vacate the stay of its enforcement, and allow the judgment of contempt to stand.