Filed 10/9/14  In re Ka. K. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re KA. K., a Person Coming Under the Juvenile Court Law. | B253542 (Los Angeles County Super. Ct. No. CK99838) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>BRANDON K.,<br><br>     Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Emma Castro, Commissioner.  Affirmed.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawn R. Harrison, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel for Plaintiff and Respondent.

# I.  INTRODUCTION

The father, Brandon K., appeals from the juvenile court's November 8, 2013 dispositional orders as to the child, Ka. K.  The father is Ka.'s biological father.  The father challenges:  Commissioner Emma Castro's authority to make jurisdictional and dispositional findings and orders in this case; the removal order because it was not supported by substantial evidence; and the juvenile court's monitored visitation order.  We affirm the disposition orders.

# II.  PROCEDURAL HISTORY

On June 26, 2013, the Los Angeles County Department of Children and Family Services (the department) filed a petition on behalf of 14-year old H.P., 11-year old Nathan P. and 16-month old Ka.  The petition alleges the father sexually abused his stepdaughter H.P.  The mother did not believe the father sexually abused H.P.  The father's sexual abuse and the mother's failure to protect H.P. endangered the youngster and placed the two other children at risk of harm.

At the June 26, 2013 detention hearing, H.P. was detained and placed with the maternal grandmother.  Nathan and Ka. were released to the mother.  The father was granted monitored visits with Ka. with the department having discretion to liberalize visits.

On November 8, 2013, the juvenile court sustained the allegations as amended under Welfare and Institutions Code[1] section 300, subdivisions (b), (d) and (j).  The juvenile court sustained counts b-1, d-1 and j-1:  "On 06/16/2013, and on numerous prior occasions, . . . the father of the child Ka., sexually abused the child [H.P.].  The [K.] father repeatedly sodomized the child by placing the [K.] father's penis in the child's anus, inflicting pain to the child.  The [K.] father fondled and digitally penetrated the

---

[1]  Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

child's anus. The [K.] father fondled the child's breasts and vagina. The [K.] father forced the child to masturbate the [K.] father's penis. The [K.] father placed [his] head on the child's lap and rubbed [his] head against the child's vagina. The [K.] father lay on top of the child. . . . The mother does not believe the [K.] father's sexual abuse of the child. Such sexual abuse of the child [H.P.] by the [K.] father and the mother's failure to protect the child endangers the child's physical health, safety and well-being and places [the] child and the child's siblings, Nathan [P.] and Ka. [K.], at risk of harm." In addition, the juvenile court amended the petition to conform to proof by sustaining an added count b-2, "The child H.P. has suffered serious physical harm as a result of [the] failure or inability of her mother to adequately supervise or protect [H.P.]."

The juvenile court removed Ka. from the father's custody. Ka. was placed with the mother. The juvenile court found by clear and convincing evidence pursuant to section 361 that there was a substantial danger to Ka. if he was returned to the father. The juvenile court stated Ka.'s emotional well-being would be affected unless the youngster was removed from the father's custody and care. The father was ordered to: attend individual therapy with a licensed therapist with child sexual abuse experience; participate in group sexual abuse counseling; and participate in individual counseling with the mother.

The father was not allowed contact with H.P. until further order from the juvenile court. The father was allowed monitored contact with Nathan with a department-approved monitor. Finally, the father was granted monitored visits with Ka. twice a week for two hours per visit.

### III. EVIDENCE

### A. Detention Report

The June 26, 2013 detention report was prepared by children's social worker Tiffani Walton. On June 21, 2013, Ms. Walton received a referral from the Antelope

Valley Hospital alleging H.P. had been sexually abused by the father, who is her stepfather. H.P. had been taken to the hospital because of abdominal pain. H.P. disclosed the last sexual assault incident occurred three weeks earlier. H.P. stated once while the stepfather was performing anal sex, her brother Nathan said, "Brandon why are you moving the bed so much?" The caller stated H.P. was "scared" of her stepfather and afraid he would go to jail. The mother was informed about H.P.'s allegations but did not believe them. A deputy sheriff had interviewed all the parties, including H.P. and the father, but no arrest was made at the time. However, a deputy sheriff advised the father not to have any contact with the mother, H.P., Nathan and Ka.

After the referral call, Ms. Walton contacted Deputy Monica Alburez of the Los Angeles County Sheriff's Department. Deputy Alburez interviewed H.P. During the interview, H.P. disclosed the father had penetrated her anally and fondled her. Deputy Alburez reported the father denied all sexual abuse allegations.

Deputy Alburez 's June 21, 2013 incident report was attached to the detention report. According to the incident report, H.P. stated the father started touching her inappropriately about one and one-half years ago. The father would lay his head on H.P.'s lap while she was sitting on the couch. He would fondle her breasts and rub her vagina under her shorts. Several times, the father would have H.P. "jack him off" as well. H.P. stated about six months ago, the father began having anal intercourse with her in his bedroom while watching television. H.P. said this happened 15 to 20 times. Her brother Nathan was present but never knew it happened. The father would pretend to be asleep so Nathan would not suspect anything. At times, Nathan would tell the father to stop moving the bed. H.P. stated she was afraid to say anything because the father was the sole provider and the family would lose everything. H.P. did not tell the mother about the sexual abuse. H.P. did not think the mother suspected anything.

The detention report also included a forensic medical report from Sylvia Fink, who is a registered nurse at Antelope Valley Hospital. Ms. Fink conducted a forensic examination of H.P. as a member of the hospital's sexual assault response team on June 21, 2013. Ms. Fink reported H.P. had the following anal injuries: multiple clefts around

4

the anus; reddened perianal tissue with some white spots; and possible scar tissue along the rectum with red linear marks. Ms. Fink was present during H.P.'s interview with Deputy Alburez. During that interview, H.P. said her stepfather began touching her about one and a half years ago. H.P. stated the stepfather had anal sex with her about six months ago. Nathan was present about half of the times she had anal sex with the stepfather. H.P. stated the stepfather last touched her on Father's Day but there was no intercourse. Ms. Fink observed H.P. cried during the interview. H.P. asked if her stepfather would be okay. H.P. indicated she did not want him to get in trouble because he was the provider. H.P. stated, "If he goes we will lose everything."

Ms. Walton interviewed H.P. at Antelope Valley Hospital on June 21, 2013. H.P. reported the sexual abuse started a year ago. On one occasion, the father put his head in H.P.'s lap near her private area. The father gradually began touching her, giving her neck and back massages and fondling her private areas. H.P. did not resist or report it to anyone. About 8 to 10 months ago, the father made H.P. masturbate him. About 6 to 8 months ago, the father began engaging in anal sex with H.P. She denied the father forced her to have sex with him or touch him. In addition, H.P. denied the father ever threatened her. H.P. stated her mother did not know about the abuse because she was not present when it occurred. H.P. stated she knew what her stepfather did was wrong but she cared for him deeply and did not want to get him in trouble. She wanted to continue having a relationship with her stepfather because he was the only person she considered to be a father.

Ms. Walton also interviewed the mother at Antelope Valley Hospital. The mother was distraught by the allegations. But she doubted the allegations were true because there was not enough physical evidence to support them. The mother could not think of when the father and H.P. were left alone. According to Ms. Walton, "The mother] stated she thought [H.P.] made the allegations because she was upset with her and [the father.]" H.P. did not like the new rules that were imposed after the father moved into the home about two years ago. About a year ago, H.P. had tried to get the two adults to hit her so she could report the abuse to the department. They did not hit her. The mother reported

5

H.P. displayed some sexualized behavior. On one occasion, the mother found H.P. had been searching and looking at online pornography sites. On another occasion, the mother found some letters in which H.P. had been writing to an unknown friend discussing sexual activity. The mother did not address these concerns with H.P. H.P. never said anyone had touched her inappropriately including the father.

Ms. Walton interviewed Nathan on June 24, 2013. Nathan denied any abuse or neglect. Nathan never witnessed or suspected H.P. or Ka. were being abused. Nathan stated H.P. was rarely left alone with the father. Also, Nathan denied saying anything about the father shaking the bed.

Ms. Walton also interviewed the father on June 24, 2013. The father denied the allegations. He did not know why H.P. would make such serious allegations. The father suspected H.P. was upset because he had grounded her a week ago as punishment for a school incident. Ms. Walton wrote, "[The father] stated that he considered[ H.P.] and Nathan like his own children and would never hurt them in any way."

### B. Jurisdiction And Disposition Report

The August 1, 2013 jurisdiction and disposition report was prepared by dependency investigator Erika Jones. On July 10, 2013, Ms. Jones contacted Detective Amis from the Los Angeles County Sheriff's Department, Special Victims Bureau. Detective Amis reported H.P. told him she wanted to recant when he conducted a second interview with her on July 8, 2013. He was alarmed because children typically will not use the word "recant" when they want to take back their original report of sexual abuse. Detective Amis observed H.P. appeared nervous when she told him she wanted to take back what she had reported to other sheriff's investigators. He suspected H.P. might have been coached about recanting her statements. Detective Amis reported H.P. stated she inflicted damage to her anus by digitally penetrating herself. Detective Amis indicated he would be arranging a forensic interview for H.P. because she had recanted her allegations.

6

Detective Amis stated he had forensic photographs taken during H.P.'s forensic examination. However, he could not release the photographs to Ms. Jones because he had not yet presented the evidence to the district attorney's office. Detective Amis stated: "The photos are horrible. They're horrendous. The trauma to the anus is so significant that it is apparent that there was repeated trauma to the anus. H.P.'s anus is mangled and shredded. She told me she caused the damage herself. She said she would stick three or four fingers in her anus. There's no way she could have done that damage herself. She has way too much trauma and scarring to the anus."

Ms. Jones was unable to interview H.P. after the maternal grandmother cancelled the appointment. The maternal grandmother stated H.P. had food poisoning. Ms. Jones and H.P.'s counsel later agreed the youngster should have a forensic interview instead of being questioned by Ms. Jones.

Ms. Jones interviewed Nathan, who denied observing any of the incidents reported by H.P. Nathan denied telling the father to stop moving the bed. He stated: "I know that Brandon didn't touch her. Brandon gave his life to the lord. I know Brandon would never do nothing without the lord's permission." When Ms. Jones asked why H.P. would make up such serious allegations, Nathan responded their stepfather had rules. According to Nathan, H.P. did not like to follow the rules. Ms. Jones wrote, "Nathan reported that he viewed [his stepfather] as his father . . . ." Nathan wanted to continue having a relationship with the father. The father participated in sports with Nathan and paid the family's bills. Nathan stated: "Brandon is the biggest father I ever had. He helps me take care of my lizard, he helps me with school, he helps with everything. I want to see him. I'm very, very sad that I can't see him."

The mother told Ms. Jones that H.P. may have accidently made up the sexual abuse allegations while the child was on morphine. H.P. was given a lot of morphine because of abdominal pain. The mother did not believe H.P. and the father had engaged in anal sex for the past six months. The mother stated: "[H.P.] could have had the anal clefts from constipation. She was constantly constipated and it bothered her about once or twice a month." The mother discussed how H.P. reported Nathan was present during

7

the sexual abuse. The mother told Ms. Jones: "Nate's not dumb. He would have known." The mother explained the family's day to day schedule was filled with activities leaving very little time for H.P. and the father to spend time alone. The mother stated the father was gone all day until 4:00 p.m. during the weekdays and coached Nathan's baseball team in the evenings and weekends. After school, the children completed homework and had baseball and softball practice.

The mother reported H.P. had been addicted to pornography for the last three years. The mother and the father had taken H.P.'s laptop, IPod Touch and cell phone away from the youngster. The mother reported she had H.P. attend church counseling. The mother and father also took measures to wipe H.P.'s IPod clean and had a computer technician install blocks to prevent the child from accessing inappropriate materials.

The father stated he and the mother had been dealing with H.P.'s pornography addiction over the past year and a half. He reported they had sought out counseling for H.P. at their church. The father stated their family had a very tight schedule and there were very rare moments when he and H.P. were alone. He reported leaving for work at 4:00 a.m. and returning home about 3:00 p.m. When the father returned home from work, the family would go to the children's extracurricular activities and not return home until about 8:00 p.m. The father reported Saturdays were typically game days for H.P.'s softball and Nathan's baseball teams. Sundays were reserved for attending church and spending time with family. The father added he was diagnosed with sleep apnea, which required him to wear a mask connected to a machine while sleeping.

Ms. Jones interview Steven P., H.P. and Nathan's father, by telephone. Steven reported he had been unable to contact the children or the mother in the past couple of months. Steven indicated he was unaware of the sexual abuse allegations. Steven stated: "She never once mentioned it to me. I usually talk to [H.P.] every morning on her way to school. . . . She never even hinted it. If she would have told me you would be investigating a murder case right now. I want [H.P.] to come home with me."

8

## C. Testimony At Jurisdiction And Disposition Hearing

The juvenile court heard testimony from: Nathan; the mother; H.P.; Dr. Earl S. Fuller; Ms. Fink; Ms. Jones; and Ms. Walton. Nathan testified to watching movies and "Survivor" with H.P. and the father in bed in the mother's bedroom. Nathan sat in the middle between H.P. and the father. Nathan stated the father wore a mask while watching television and sleeping because of sleep apnea. Nathan saw H.P. give the father back massages. Nathan never saw the father massage H.P. or touch her in the chest area or between her legs. Nathan testified H.P. did not like following the father's rules. He stated H.P. would spend a lot of time on the Internet at night. Nathan testified H.P. once showed him pornography on her laptop in her room about two or three years ago. He was sad about the current situation. Nathan was close to the father and H.P. Nathan did not believe the father had touched H.P. inappropriately.

The mother testified her relationship with the father began in November 2011 and they married in March 2013. The father moved into her home in May or June 2012. The mother did not believe the sexual abuse allegations. The mother testified H.P. was administered morphine in the hospital and woke up very confused and scared. The mother was first aware of H.P. watching pornography in 2010. The mother removed all electronic access and grounded H.P. for a period of time.

H.P. testified she went to the hospital in June 2013 because she had severe abdomen pain. While in the hospital, H.P. spoke to a nurse. H.P. was asked if she was sexually active. H.P. testified: "She had said that, 'Are you sure you haven't been sexually active? Are you sure? Are you sure? . . . I can't recall in specific words, but she had said, 'Are you sure? Are you sure?' [¶] And she just kept saying that, 'You're going to die[.']" During the physical exam at the hospital, H.P. said she was sexually molested by her stepfather. H.P. made these statements to a physician, a nurse and an "officer." H.P. was prompted to do so because she was told she was going to die. H.P. denied her stepfather ever touched her breasts, vaginal area or butt. H.P. testified she

9

stated Nathan was present to make her story "sound more real." She denied ever having anal sex or engaging in any sexual behavior with another person.

H.P. testified she was addicted to pornography and started looking at it over the Internet about three to four years ago. H.P. stated she sometimes masturbated while watching pornography. She testified on bad days she watched rougher types of pornography and would masturbate using more fingers in her anus.

On three occasions, the mother discovered H.P. was watching pornography. One each occasion, the mother took away H.P.'s computer. In addition, on the third occasion, H.P.'s IPod and cell phone were taken away. Also, the mother grounded H.P. for two to three months.

H.P. stated she told Detective Amis she wanted to recant her sexual abuse allegations. Detective Amis asked H.P. how she knew the word "recant." H.P. responded she learned the word "recant" from watching "Criminal Minds" and "CSI." H.P. testified she told Detective Amis she could not take the guilt of knowing she had lied and that she was to blame for the collapse of her family. H.P. also told Detective Amis her anal injuries were self-inflicted using her fingers.

Dr. Fuller testified on behalf of the father. The juvenile court found Dr. Fuller qualified to testify on sexual abuse examinations by review of documents. Dr. Fuller testified the damage to H.P.'s anus was self-inflicted. He stated it was unlikely that the anal injuries were caused by the forcible entry of a penis into the anus. Dr. Fuller stated sodomy over a period of two years would cause superficial trauma but not the clefts or inner sphincter tears that were found during the forensic examination of H.P.'s anus. The damage was not by regular anal intercourse but could be caused by digital penetration if enough fingers were placed inside the anus. Dr. Fuller stated he had never seen an anal sphincter as ruptured as H.P.'s sphincter. H.P.'s anal injuries resulted from multiple occasions of digital penetration. But Dr. Fuller acknowledged the damage could have been caused by both digital penetration and sodomy.

Ms. Fink has been a forensic examiner at Antelope Valley Hospital since 2009. The juvenile court found Ms. Fink was qualified in the area of sexual assault as a member

10

of the hospital's sexual abuse response team. Ms. Fink spoke to H.P. H.P. said her stepfather had sexually abused her. H.P. said her stepfather anally assaulted her with his penis and finger. H.P. said the sexual touching began a year and a half ago and gradually went to anal intercourse. Ms. Fink observed H.P. cried, looked down and appeared worried while disclosing the sexual abuse. H.P. stated she did not want to get her stepfather in trouble because he was the provider and the only person that really cared about her. H.P. appeared fully alert and did not appear to be on any kind of medication during the forensic examination. Ms. Fink testified H.P.'s anal injuries were consistent with the history provided by the child. Ms. Fink stated she had never seen anal injuries comparable to those suffered by H.P.

## IV. DISCUSSION

### A. The Father Is Estopped To Challenge Commissioner Castro's Authority To Issue The Adjudication And Dispositional Order

The father contends that the November 8, 2013 jurisdictional and dispositional findings and orders are void. The father argues that Commissioner Castro acted without authority when she made the November 8, 2013 jurisdictional and dispositional findings and orders. The father contends Commissioner Castro was not authorized to sit in the juvenile court as a referee. The sole irregularity relied upon by the father is that Commissioner Castro was never assigned to act as a juvenile court referee.

The father relies upon the following language in our Supreme Court's decision of *In re Mark L.* (1983) 34 Cal.3d 171, 176 (*Mark L.*): "The Juvenile Court Law provides that many matters may be heard and decided in the first instance by referees rather than judges. (§§ 247-250.) However, referees, sitting as such, are but 'subordinate' judicial officers with limited powers. (Cal. Const., art. VI, § 22; *In re Edgar M.* (1975) 14 Cal.3d 727, 732.) All their findings and orders are subject to rehearing de novo by a juvenile court judge, either at the minor's request or on the judge's own motion. (§§ 248-254.)."

11

(Fn. omitted.) Additionally, the father relies upon the omitted footnote in the immediately preceding quotation in *Mark L.*: "The Juvenile Court Law makes no provision for the use of *commissioners* in juvenile court. They have no power as juvenile referees unless appointed as such by the presiding judge of the juvenile court. (§ 247; *In re Edgar M.*, [] *supra*, 14 Cal.3d [at p.], fn. 6.)" (*Mark L.*, *supra*, 34 Cal.3d at p. 176, fn. 4.) Finally, the father relies upon the following quotation from another footnote in *Mark L.*: "When commissioners sit in juvenile court under appointment *as referees*, their 'powers' *in that regard* derive exclusively from the laws defining referees, and 'are not affected by the fact that they hold the additional and separate office of court commissioner.' (*In re Edgar M., supra*, 14 Cal.3d 727, 733, fn. 6.) But their authority to sit *as juvenile judges* may properly arise under the laws governing commissioners. Here the presiding judge of the superior court had expressly empowered [James] Browning, as commissioner, to sit in a judicial capacity, upon proper stipulation of the parties, in *any* cause assigned to him in *any* department, including juvenile. (See Cal. Const., art. VI, § 21, *supra*; Code Civ. Proc., § 259, subd. (5).) The designation of court officers to act as juvenile court *judges*, of course, is within the express authority of the presiding judge of the superior court. (Welf. & Inst. Code, § 246.)." (*Mark L.*, *supra*, 34 Cal.3d at p. 178, fn. 5.)

The parties have secured judicial notice of a series of superior and juvenile court orders. On January 4, 2001, former Presiding Judge James A. Bascue issued the following order: "IT IS HEREBY ORDERED pursuant to Government Code section 71622, subdivision (d) that effective January 4, 2001, and continuing until further order of the Court, all subordinate judicial officers of the Court are cross-assigned without additional compensation to exercise all the powers and perform all the duties authorized by law to be performed by another type of subordinate judicial officer if the person cross-assigned satisfies the minimum qualifications and training requirements for the new assignment established by the Judicial Council pursuant to Government Code section 71622, subdivision (c)." Additionally, former Presiding Judge Bascue directed the court executive officer to verify: the position to which the subordinate judicial officer was

12

assigned was funded and authorized; the person assigned met the minimum qualifications for the position; and the individual satisfied the training requirements for the assignment.

On November 21, 2012, Los Angeles Superior Court Presiding Judge-Elect David S. Wesley issued an order assigning 11 commissioners to the juvenile courts. Judge Wesley ordered that the commissioners be assigned as juvenile court temporary judges. The effective date of Judge Wesley's order was January 2, 2013, and was subject to further court order. Commissioner Castro's name is not among the 11 judges assigned effective January 2, 2013.

On January 14, 2013, Juvenile Court Presiding Judge Michael Nash issued an order appointing eleven superior court commissioners, previously assigned by order of the presiding judge of superior court as judges pro tempore, to sit as referees. Commissioner Castro is not listed among the commissioners appointed as juvenile court referees effective January 1, 2013.

On May 3, 2013, Los Angeles Superior Court Presiding Judge Wesley issued an order effective May 1, 2013 assigning certain commissioners to preside in juvenile court. The commissioners were appointed temporary judges while sitting in juvenile court or in any other department in which they may preside in superior court. Commissioner Castro was named as one of the commissioners appointed to sit as a temporary judge in juvenile court.

On November 8, 2013, Juvenile Court Presiding Judge Nash issued an "all-purpose" assignment for various dependency court judicial officers: "Having been appointed as the Presiding Judge of the Juvenile Court pursuant to Welfare and Institutions Code section 246 and Los Angeles Superior Court Local Rule 1.0, and the Presiding Judge of the Los Angeles Superior Court having delegated to the Presiding Judge of the Juvenile Court, the authority to determine whether cases will be assigned to particular judicial officers and departments as 'all purpose' courts, and there being good cause to do so, cases assigned to the judicial officers presiding in the departments listed in the attachment are assigned to the judicial officers regularly presiding in such departments for all purposes including trial." The list of dependency court assignments

13

attached to Judge Nash's November 8, 2013 order indicates that Commissioner Castro was assigned effective June 4, 2013, in department 427.

On January 2, 2014, Juvenile Court Presiding Judge Nash issued orders effective January 1, 2014, assigning certain commissioners to act as judges pro tempore and as referees: "It is hereby ordered that effective January 1, 2014 and continuing until further order of the court, the following named Superior Court Commissioners previously assigned by order of the Presiding Judge of the Superior Court to sit in Juvenile Court assignments as Judges Pro Tempore, are also appointed to sit as referees pursuant to Section 248 et seq. Welfare and Institutions Code, and pursuant to the authority delegated to the Presiding Judge of the Juvenile Court by the Presiding Judge of the Superior Court . . . while presiding in their assigned departments or in any other assigned department within the Juvenile Court . . . ." Commissioner Castro was named as one of the commissioners who were assigned to sit as judges pro tempore or as referees. On September 4, 2014, Judge Nash assigned an additional commissioner to sit as a judge pro tempore or referee.

We need not address the issue of the scope of the judicially noticed orders. The father's argument is that Commissioner Castro did not have jurisdiction to issue the jurisdictional and dispositional orders. The father is estopped to deny that Commissioner Castro had jurisdiction to proceed with the jurisdictional and dispositional hearings. At no time did the father interpose an objection to Commissioner Castro conducting the hearings or returning her findings. Our Supreme Court has held: "When, as here, the court has jurisdiction of the subject, a party who seeks or consents to action beyond the court's power as defined by statute or decisional rule may be estopped to complain of the ensuing action in excess of jurisdiction. (*City of Los Angeles v. Cole* (1946) 28 Cal.2d 509, 515[, overruled on a different point in *County of Los Angeles v. Faus* (1957) 48 Cal.2d 672, 680]; *Guardianship of Di Carlo* (1935) 3 Cal.2d 225, 228-229; *People v. Patrich* (1897) 118 Cal. 332, 333; *Hoshour v. County of Contra Costa* (1962) 203 Cal.App.2d 602, 605; *Phillips v. Beilsten* (1958) 164 Cal.App.2d 450, 457; *Munns v. Stenman* (1957) 152 Cal.App.2d 543, 557-558; *Blue v. Superior Court* (1956) 147

14

Cal.App.2d 278, 285; see 30A Am.Jur., Judgments, § 47; 21 C.J.S., Courts, §§ 108, 109.) Whether he shall be estopped depends on the importance of the irregularity not only to the parties but to the functioning of the courts and in some instances on other considerations of public policy. A litigant who has stipulated to a procedure in excess of jurisdiction may be estopped to question it when 'To hold otherwise would permit the parties to trifle with the courts.' (*City of Los Angeles v. Cole*[, *supra,*] 28 Cal.2d [at p.] 515.)" (*In re Griffin* (1967) 67 Cal.2d 343, 347-348.)

These estoppel principles are illustrated in *Gee v. American Realty & Construction, Inc.* (2002) 99 Cal.App.4th 1412, 1413-1415. There, a judgment creditor recorded abstracts of judgment and requested that a commissioner order them filed with a county recorder's office. (*Id.* at p. 1413.) However, the judgment was automatically stayed because a notice of appeal had been filed from an award of costs and contractual attorney fees. (*Id.* at pp. 1413-1415.) The commissioner ordered that the abstracts of judgment be released which he had no authority to do as the action was automatically stayed. (Id. at pp. 1413-1414.)

The Court of Appeal held that the judgment creditor was estopped to contest the jurisdiction of the commissioner. Citing *Griffin*, the Court of Appeal held: "'The undeniable fact is that defendants asked the trial court to exercise its discretion under Code of Civil Procedure section 917.1 to allow the filing of the abstracts, which defendants had already filed. Defendants are now in the position of arguing that their motion was essentially pointless, in that the trial court had no authority to deny it. Defendants conceded as much at oral argument, stating that going to the Commissioner was probably a mistake. "When, as here, the court has jurisdiction of the subject, a party who seeks or consents to action beyond the court's power as defined by statute or decisional rule may be estopped to complain of the ensuing action [as being] in excess of jurisdiction." (*In re Griffin*[, *supra,*] 67 Cal.2d [at p.] 347.) The basis for the estoppel is that "'[t]o hold otherwise would permit the parties to trifle with the courts.'" (*Id.* at p. 348, quoting *City of Los Angeles v. Cole*[, *supra,*] 28 Cal.2d [at p.] 515.) This principle is now well established and widely applied. (E.g., *Conservatorship of Kevin M.* (1996) 49

15

Cal.App.4th 79, 91-92; *Law Offices of Stanley J. Bell v. Shine, Browne & Diamond* (1995) 36 Cal.App.4th 1011, 1022-1023; *Adoption of Matthew B.* (1991) 232 Cal.App.3d 1239, 1268-1269; *People v. Jones* (1989) 210 Cal.App.3d 124, 135-137.) It is appropriately applied here. Defendants are not claiming that the trial court lacked jurisdiction in the most fundamental sense that is "an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288.) They are belatedly challenging the result generated by the procedure they initiated with their motion . . . ." (*Gee v. American Realty & Construction, Inc.*, *supra*, 99 Cal.App.4th at p. 1414.)

This is an appropriate case to apply estoppel principles. The juvenile court had authority over the dependency proceedings. Commissioner Castro was sitting in the dependency court pursuant to an all purposes assignment. Commissioner Castro conducted 19 days of proceedings between June 26, through November 8, 2013. Commissioner Castro presided over all of the proceedings ranging from the detention through the dispositional hearings. The reporter's transcript consists of 674 pages virtually all of it of testimony presented to Commissioner Castro. The alleged irregularity in this case involves a court commissioner who has been assigned to the juvenile court in an all purposes capacity. During none of the 19 days of proceedings did the father contest Commissioner Castro's authority to issue any orders. The issue was not raised in the opening brief which was filed on May 5, 2014. The first time the issue was presented was in a supplemental brief filed on May 28, 2014--over 6 months after the notice of appeal was filed. The alleged irregularity in this case involves failure of the juvenile court presiding judge to expressly assign Commissioner Castro as a juvenile court referee. There is no evidence this unobjected to irregularity contravened any of the purposes of the juvenile court law. Under these circumstances, it is appropriate to apply the law of estoppel. The father is estopped to challenge Commissioner Castro's authority to issue any of her orders.

16

B.  Removal Order

Section 361, subdivision (c)(1) provides:  "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . .  :  [¶]  (1) [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . ."  Section 361, subdivision (d) states:  "The court shall make a determination as to whether reasonable efforts were made to prevent or eliminate the need for removal of the minor from his or her home . . . .  The court shall state the facts on which the decision to remove the minor is based."

The purpose of section 361 is to avert harm to the child.  The parent need not be dangerous nor the child actually harmed before removal is appropriate.  (*In re T.V.* (2013) 217 Cal.App.4th 126, 135-136; *In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)  The juvenile court may consider both the parent's past conduct and the present circumstances.  (*In re Cole C., supra,* 174 Cal.App.4th at p. 917; *In re S.O.* (2002) 103 Cal.App.4th 453, 461.)  We review the removal order for substantial evidence.  (*In re Lana S.* (2012) 207 Cal.App.4th 94, 105; *Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1078.)

The father challenges the removal order arguing the evidence does not establish a substantial danger to one-year old Ka.  We conclude substantial evidence supports the removal order.  The father argues H.P. is not his biological child.  But Ka. is and hence he is not in sufficient danger to permit removal.  We have expressly rejected the theory that a child is not at risk because only a half-sibling was molested.  (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 968, 970.) The sexual abuse of one child may constitute substantial evidence of risk to another child in the household–even to a sibling of a different sex, age, or a half-sibling.  (*Id.* at p.

17

968; *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1332.) H.P. sustained serious injuries to her anus because of the father's sexual abuse. Detective Amis told Ms. Jones, the dependency investigator: "The photos are horrible. They're horrendous. The trauma to the anus is so significant that it is apparent that there was repeated trauma to the anus. [H.P.'s] anus is mangled and shredded." Ms. Fink had never seen anal injuries comparable to those suffered by H.P. Dr. Fuller testified he had never seen an anal sphincter as ruptured as H.P.'s sphincter. Given the severity of the father's sexual abuse of H.P., removal was warranted even if there was a low probability Ka. would be at substantial risk of abuse. Our Supreme Court explained: "[T]he more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300." (*In re I.J.* (2013) 56 Cal.4th 766, 778; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 222 Cal.App.4th 149, 164.)

The father also argues except for the sexual abuse allegations as to H.P., he has appropriately parented the children and provided for the family. H.P. and Nathan considered their stepfather to be a father figure. Ms. Walton's detention report relates, "[The father] stated that he considered [H.P.] and Nathan like his own children and he would never hurt them in any way." Yet there is substantial evidence the father sexually abused H.P. even though he occupied a parental role. Our Supreme Court has stated: "'[S]exual or other serious physical abuse of a child by an adult constitutes a fundamental betrayal of the appropriate relationship between the generations. . . . Such misparenting is among the specific compelling circumstances which may justify state intervention, including an interruption of parental custody. (See § 300, subds. (d), (e), (j).)'" (*In re I.J., supra,* 56 Cal.4th at p. 778; *In re Kieshia E.* (1993) 6 Cal.4th 68, 76–77.) Substantial evidence supports the sexual abuse allegation and, hence, the removal order.

The father further asserts the removal order was erroneous because the department failed to consider whether there were reasonable means to protect Ka. In addition, the father argues the juvenile court failed to make the required finding that reasonable efforts were made to prevent or eliminate the need for Ka.'s removal from the father's custody.

Any purported error by the juvenile court was harmless because it was not reasonably probable that such finding, if made, would have been in favor of continued parental custody.  (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1137, disapproved on other grounds in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6; *In re Jason L.* (1990) 222 Cal.App.3d 1206. 1218.)

## C.  Visitation Order

Section 362.1, subdivision (a) provides in relevant part:  "(a) In order to maintain ties between the parent or guardian and any siblings and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent or guardian, or to encourage or suspend sibling interaction, any order placing a child in foster care, and ordering reunification services, shall provide as follows:  [¶] (1)(A) Subject to subparagraph (B), for visitation between the parent or guardian and the child.  Visitation shall be as frequent as possible, consistent with the well-being of the child.  [¶] (B)  No visitation order shall jeopardize the safety of the child.  . . ."  The Court of Appeal has explained, "'[T]he parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense[.]'"  (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2006) 145 Cal.App.4th 692, 699; *In re S.H.* (2003) 111 Cal.App.4th 310, 317.)  The juvenile court has the power to regulate visitation between a dependent child and the parents.  (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557; *In re Jennifer G.* (1990) 221 Cal.App.3d 752, 756.)  We review a visitation order for abuse of discretion.  (*In re S.H., supra*, 197 Cal.App.4th at p. 1557; *In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.)

The father argues the juvenile court abused its discretion in ordering visits with Ka. be monitored.  The father contends there is no showing unmonitored visits with Ka. would be detrimental to the child.  But the juvenile court was not required to make a finding of detriment before ordering *monitored* visits.  A juvenile court is not required to make a detriment finding unless it denies visitation.  (*In re S.H., supra,* 197 Cal.App.4th

19

at p. 1558; *In re Mark L.* (2001) 94 Cal.App.4th 573, 580.)  The juvenile court did not abuse its discretion by ordering monitored visits.  There is substantial evidence he abused H.P.  The father has not acknowledged or addressed his sexually aberrant behavior through counseling and therapy.  In addition, the mother, who has custody of Ka., refused to believe H.P. was sexually abused by the father.  Without abusing its discretion, the juvenile court could conclude monitored visits were in Ka.'s best interest to ensure his safety.  (*In re R.R., supra,* 187 Cal.App.4th at p. 1284; *In re Jennifer G., supra,* 221 Cal.App.4th at p. 756.)

## V.  DISPOSITION

The orders under review are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

KRIEGLER, J.

MINK, J.[*]

---

[*]  Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20